# EXHIBIT D

# In The Matter Of:

*Monique Bass v.*
*Bomber, Todd, Murphy, and City of Detroit*

---

*Eugene Bomber*
*Vol. I*
*October 30, 2017*
*Eugene Bomber*

---

*Court Reporting Services*
*Oakland County, Waterford, Michigan*
*www.courtreportingservices.org*

Original File Bomber, Eugene.txt

---

**Page 1**

```
 1              UNITED STATES DISTRICT COURT
 2              EASTERN DISTRICT OF MICHIGAN
 3
 4                   *      *      *
 5
 6   MONIQUE BASS,
              Plaintiff,
 7                              Case No. 2:17-CV-10531
    - vs. -                     Hon. Nancy G. Edmunds
 8
 9   EUGENE BOMBER, JOHANNA TODD,
     BRIDGITTE MURPHY, and the
10   CITY OF DETROIT, in their
     individual and official
11   capacities,
              Defendants.
12                                         /
13
14
15
16   DEPONENT:      EUGENE BOMBER
17   DATE:          Monday, October 30, 2017
18   TIME:          12:12 p.m.
19   LOCATION:      2 Woodward Avenue, 5th Floor
20                  Detroit, Michigan
21
22   REPORTED BY:   JENNIFER DIANE CLAUSON, CSR-6867
23                  Court Reporting Services
24                  courtreportingservices@ymail.com
25
```

**Page 2**

```
 1   APPEARANCES:
 2
 3   SHAWN CABOT, ESQUIRE
 4   Christopher Trainor & Associates
 5   9750 Highland Road
 6   White Lake, Michigan 48386
 7   (248) 886-8650
 8           Appearing on behalf of the Plaintiff.
 9
10   LYNN REHMAN-BARTON, ESQUIRE
11   City of Detroit Law Department
12   2 Woodward Avenue, Suite 500
13   Detroit, Michigan 48336
14   (313) 237-0413
15           Appearing on behalf of the Defendants.
16
17
18   Bridgitte Murphy
19   Johanna Todd
20
21
22
23
24
25
```

**Page 3**

```
 1                    {I N D E X}
 2   WITNESS                            PAGE
     -------                            ----
 3      EUGENE BOMBER
 4   Examination by Mr. Cabot..............4
 5   Examination by Ms. Rehman-Barton......71
 6
 7
 8              *    *    *
 9
10   E X H I B I T S             PAGE # MARKED
     -------------               ------------
11   Deposition Exhibit No. 1..........20, 21, 27, 30, 45, 46
12                               48, 49, 53
13   Deposition Exhibit No. 2..........21, 22, 27, 28, 29, 30
14                               46, 49, 53
15   Deposition Exhibit No. 3..........33
16   Deposition Exhibit No. 4..........57, 61, 63, 64, 66
17   Deposition Exhibit No. 5..........68
18   Deposition Exhibit No. 6..........68
19   Deposition Exhibit No. 7..........69
20   Deposition Exhibit No. 8..........69, 70
21
22
23
24
25
```

**Page 4**

```
 1   Detroit, Michigan
 2   Monday, October 30, 2017
 3   At or about 12:12 p.m.
 4        *   *   *   *   *
 5             EUGENE BOMBER
 6   Having been first duly sworn by the Notary Public
 7   to tell the truth, the whole truth, and nothing
 8   but the truth, testified upon his oath as follows:
 9             EXAMINATION
10   BY MR. CABOT:
11   Q. Would you please state your full name for the record?
12   A. I am Sergeant Eugene Bomber.
13        MR. CABOT: Please let the record reflect that
14   this is the deposition of Eugene Bomber taken pursuant to
15   notice and agreement of counsel and to be used for any and
16   all purposes consistent with the Federal Court Rules and
17   the Federal Rules of Evidence.
18   Q. (BY MR. CABOT):  Good afternoon.
19   A. Good afternoon.
20   Q. My name is Shawn Cabot.  I'm one of the attorneys
21   representing Monique Bass regarding an incident that
22   occurred back in May of 2015.  This is a discovery
23   deposition, which just means I'm going to ask you a bunch
24   of questions today.  Have you ever had your deposition
25   taken before?
```

Monique Bass v.
Bomber, Todd, Murphy, and City of Detroit

Eugene Bomber

Eugene Bomber – Vol. I
October 30, 2017

Page 5

1 A. No.
2 Q. All right. So I'm going to go over the same grounds rules
3    that I went over with your colleague just so that I know
4    you understand them since this is your first one.
5         To my right and your left is a court
6    reporter. As you can see, she's typing way. That's what
7    she's going to do for the next little bit. So to help her
8    do her job well and we can actually help her do that, we
9    have to make sure we always give verbal responses to my
10   questions. A lot of times when we naturally communicate,
11   we just nod our head or shrug our shoulders, and things
12   like that. You can do that, but you have to accompany it
13   with a verbal response.
14        If I ask a yes-or-no question, please say
15   yes or no versus an uh-uh or an uh-huh because your
16   attorneys and I will read these transcripts later and with
17   uh-uhs and uh-huhs, we don't know if it's a yes or no. So
18   if you do that, don't take offense to me asking you if
19   that was a yes or no, I got to do it just so that there's
20   no question of what your testimony was.
21        If I ask you a question that you don't
22   understand or it doesn't make sense to you, I want you to
23   let me know that and I'll rephrase it. You know, I think
24   ever question I ask is a great and understandable
25   question, but I'm not the one that's got to answer it. So

Page 6

1 if it's not, let me know that, and I'll rephrase it.
2 Otherwise, if you give me an answer, I'm going to assume
3 you understood the question.
4         If at any time you need to take a break,
5 restroom, smoke break, whatever the case may be, that's
6 fine. I don't have a problem with that. I just want you
7 to answer any question that I've asked before you leave
8 and take that break, that's all.
9         Also the last deponent and I did pretty
10 good. I anticipate the same with you, but please wait
11 until my question's done before you answer, and likewise,
12 I'll do my best not to ask a question until I think your
13 answer's done and that just allows the court reporter a
14 good opportunity to get the full question and get the full
15 response down. It just helps her to do her job, okay?
16 A. Okay.
17 Q. All right. Prior to your deposition today, have you
18    discussed this matter with anyone other than your
19    attorneys?
20 A. Just my partner.
21 Q. Okay. And your partner's name is for the record?
22 A. Well, former partner, Johanna Todd.
23 Q. Okay. And when did you two have a discussion of the case?
24 A. Today.
25 Q. Okay. Was that --

Page 7

1 A. While we were sitting here.
2 Q. Was that with your attorney?
3 A. Yes.
4 Q. Okay. So I'm going to let you know anything you discussed
5    with your attorneys off game. I don't get to know it as
6    much as I would like to. I don't get to know it. So was
7    that conversation done in the presence of your attorney?
8 A. Yes.
9 Q. Okay. Any other discussions other than what you had
10    today?
11 A. No.
12 Q. All right. Have you reviewed anything in preparation for
13    today?
14 A. The warrant, the complaint form with the questions.
15 Q. And when you say the warrant complaint form with the
16    questions?
17 A. The LEIN printout.
18 Q. Okay.
19 A. And then the complaint form.
20 Q. And what's the complaint?
21 A. Well, it would be with the questions on it.
22        MS. REHMAN-BARTON: Interrogatory responses.
23 Q. (BY MR. CABOT): Oh, the Interrogatories?
24 A. Yeah, yeah.
25 Q. Oh, okay. All right. Other than that, anything else

Page 8

1 you've reviewed?
2 A. No.
3 Q. Okay. With respect to this incident, any documents that
4    you would have drafted other than an activity log which
5    we're going to look at?
6 A. That I would have drafted?
7 Q. Yeah. Or completed?
8 A. No.
9 Q. Okay. Any video or audio of the incident?
10 A. Not that I'm aware of.
11 Q. Okay. Do you know if your cars even had video back in May
12    of 2015?
13 A. That's a great question.
14 Q. Okay. Thank you. I don't hear that very often.
15 A. Yeah, there's no way to tell. Back then even with cars
16    with in-car video, they would seldom work.
17 Q. Okay. All right. Have you ever been sued before?
18 A. No.
19 Q. Have you ever had any performance evaluations with the
20    Detroit P.D. Police Department?
21 A. Throughout my career, yes.
22 Q. When's the last performance evaluation you got?
23 A. I don't know. I was recently promoted to the rank of
24    sergeant. So I don't know that there's an evaluation and
25    testing that goes along with that.

**Page 9**

1  Q. Okay. So that was -- but that evaluation was pursuant to
2     some type of advancement opportunity?
3  A. Correct, yes.
4  Q. Other than that, do you get like --
5  A. A yearly?
6  Q. Yeah.
7  A. Yes.
8  Q. Okay. And so have you, in fact, gotten those every year?
9  A. Yes.
10 Q. And how many times do you get those a year?
11 A. Once a year.
12 Q. And are they written or verbal?
13 A. Written.
14 Q. Do you get any training regarding arrests, warrant
15    arrests, verifying warrants, things like that?
16 A. Yeah, obviously in the academy.
17 Q. Okay. Any time after that?
18 A. Not really.
19 Q. Okay. And when did you go to the academy?
20 A. Back in 2005.
21 Q. Okay. Have you ever had any citizen complaints made
22    against you?
23 A. Yes.
24 Q. Okay. How many?
25 A. I don't know.

**Page 10**

1  Q. Any within the last seven years?
2  A. Yes.
3  Q. Okay. Any of them involve demeanor or arrests?
4  A. I -- honestly, I don't know what they're for.
5  Q. Okay. Do you know if they went up the chain of command
6     for review?
7  A. I do know that they have all been not sustained. Not
8     sustained slash exonerated.
9  Q. Sure. Have you ever been the subject of an Internal
10    Affair's investigation?
11 A. No.
12 Q. Ever been disciplined, terminated, or reprimanded in the
13    last seven years?
14 A. Seven years? I'm trying to think. I don't recall.
15 Q. Okay. Any background in the military?
16 A. No.
17 Q. I'm going to go over your education. Where did you go to
18    high school?
19 A. Warren Mott.
20 Q. My mother-in-law taught there.
21 A. What was her name?
22 Q. Cathy Sexton.
23 A. Yeah.
24       MR. CABOT: Off the record.
25       (Off the record at 12:20 p.m.)

**Page 11**

1       (Back on the record at 12:20 p.m.)
2  Q. (BY MR. CABOT): When did you graduate from there?
3  A. 1997.
4  Q. Okay. Any college?
5  A. Yes, Macomb Community College.
6  Q. And when did you attend there?
7  A. Off and on. Yeah, I couldn't tell you exactly what years.
8  Q. Okay.
9  A. Just when I could.
10 Q. Okay.
11 A. I do not have an actual degree. I have well over 90
12    credit hours though. I just haven't actually got the
13    degree.
14 Q. Okay. And what kind of classes were you taking when you
15    were going?
16 A. Criminal justice.
17 Q. Okay.
18 A. Well, my major switched from business administration to
19    criminal justice.
20 Q. It sounds like most of your credits going toward
21    criminal justice?
22 A. Yes.
23 Q. Okay. Any other colleges you've gone to?
24 A. No.
25 Q. Okay. Where did you go to the academy at?

**Page 12**

1  A. Detroit Police Academy.
2  Q. And when was that?
3  A. 2005.
4  Q. And other than -- well, I suppose we should ask. You're
5     M-COLES certified, right?
6  A. Correct, yes.
7  Q. Other than that professional certification, any other
8     certifications you have currently?
9  A. I'm sure there's a lot. I had a bunch of extra training.
10    I just -- off the top of my head, I don't know.
11 Q. And when I say certification, I mean more towards like
12    paramedic, firefighter?
13 A. No. Then no.
14 Q. Stuff like that?
15 A. I'm sorry, no.
16 Q. All right. Where are you currently employed?
17 A. As of today, the Detroit Police homicide division.
18 Q. So I'm going to assume that's pretty recent?
19 A. As of today, yes.
20 Q. Okay. And what was your job yesterday?
21 A. As of yesterday, it was patrol supervisor for the 2nd
22    precinct.
23 Q. And how long have you held that position?
24 A. Since May.
25 Q. Of 2017?

Page 13

1  A. Yes.
2  Q. And your position prior to that?
3  A. Prior to that, I worked in the 10th Precinct as a police
4     officer. I was assigned to the precinct detective unit.
5  Q. I'm sorry. Assigned to what?
6  A. The 10th Precinct precinct detective unit, aka PDU.
7  Q. And what is that?
8  A. It's -- it's the detective bureau or unit within a
9     precinct.
10  Q. Okay. And how long were you in that position?
11  A. One year.
12  Q. And you started in '05, right?
13  A. Correct.
14  Q. And you're still there? Back in May of 2015, what was
15     your position?
16  A. May of 2015, I would have been assigned to the 10th
17     Precinct special ops unit. Special operations unit.
18     Sorry.
19  Q. How long have you been in that position?
20  A. I don't know specifically, but a long time.
21  Q. Okay. So more than a couple years?
22  A. Yes, yes.
23  Q. Okay. So let's start with the PDU assignment.
24  A. Mm-hm.
25  Q. Are there any particular crimes that you focus on as a

Page 14

1     detective or is it anything that involves -- that happens
2     in that precinct?
3  A. My primary focus was on B&E's, burglaries.
4  Q. And the 10th Precinct, what area does that cover?
5  A. It goes -- well, they keep re-adjusting it, except --
6  Q. Do you -- do you know what it was in 2015?
7  A. I would be lying if I said I was a hundred percent, but
8     the gist of it is would be the Lodge to essentially 96 and
9     then at that time, I believe it may have been Finkle down
10     to West Grand Boulevard.
11  Q. Okay.
12  A. And then West Grand Boulevard jogs down to Warren. So
13     it's -- yeah, it's complicated to answer, but yeah.
14  Q. That's okay. It gives me a general sense. So the special
15     operations unit, which is what you were in in May of 2015,
16     was there kind of a focus in that position as far as what
17     you did?
18  A. The focus would change --
19  Q. Okay.
20  A. -- throughout -- throughout months throughout the years it
21     would change. And that --
22  Q. What generally -- sorry. I interrupted you. What
23     generally is it that you did in the special ops unit?
24  A. Our focus -- our primary focus was reducing part one
25     crimes within the precinct.

Page 15

1  Q. And what's a part one crime?
2  A. Any violent crimes or major crimes, i.e., homicide, non
3     fatal shootings, robberies, home invasions, things of that
4     sort.
5  Q. And back in 2015, did you have a supervisor?
6  A. Yes, oh, I know we had a supervisor. Now, which one it
7     was, we had those change a couple times too.
8  Q. Okay. So kind of focusing our attention on this incident
9     involving Ms. Bass --
10  A. Mm-hm.
11  Q. -- you were employed by the Detroit Police Department on
12     May 22nd -- May 21st, 2015, correct?
13  A. That is correct.
14  Q. And what shift did you work?
15  A. During that time?
16  Q. Yeah.
17  A. It was called platoon four, which is a power shift from 7
18     p.m. to 3 a.m. was our scheduled shift.
19  Q. Any particular reason why it was called a power shift?
20  A. The most -- the highest volume of crimes happen between
21     those hours.
22  Q. Okay.
23  A. That's why it called the power shift.
24  Q. And again, just to reiterate, what's platoon four?
25  A. Platoon four would be special operations.

Page 16

1  Q. Okay. And did you routinely have a partner?
2  A. Yes.
3  Q. And what was his or her name?
4  A. Her name is Johanna Todd.
5  Q. And so what I mean typical partner, I mean is that the
6     partner you normally would expect to work with when you
7     went in on your shift absent vacations or something like
8     that?
9  A. Yes.
10  Q. Okay.
11  A. Yes.
12  Q. How long had you worked with Ms. Todd?
13  A. That's a great question.
14  Q. Another good one. Two great ones in the same dep.
15  A. Yeah.
16  Q. Wow. That's a historic for me.
17  A. It's -- I don't know.
18  Q. Do you think it was more than a year?
19  A. At that point?
20  Q. Yeah.
21  A. Honestly, it -- it feels like we've been partners forever.
22  Q. Okay.
23  A. She's like my sister. So I don't know, yeah.
24  Q. Okay. That's fine. But on the day of this incident,
25     wasn't the first time you had worked with her?

Monique Bass v.
Bomber, Todd, Murphy, and City of Detroit

Eugene Bomber

Eugene Bomber - Vol. I
October 30, 2017

Page 17

1  A. No, probably not.
2  Q. All right. And for the record, you're a Caucasian male,
3    correct?
4  A. That is correct, yeah.
5  Q. And approximate height and weight back then?
6  A. Five-10, probably somewhere in the neighborhood of 230
7    pounds.
8  Q. And your hair color back then?
9  A. I never dye it. So it's always been brown.
10 Q. Okay. And it's relatively short cut?
11 A. Well --
12 Q. Or back then --
13 A. Back then depending on what we had going on, I could have
14   looked homeless at that point. Yeah.
15 Q. Okay.
16 A. So it varies. I don't remember.
17 Q. Sure. Light facial hair today. Did you have light facial
18   hair back then?
19 A. It might have been a full on beard at that point.
20 Q. Okay.
21 A. I don't remember.
22 Q. And I see you have glasses today. Did you wear glasses --
23 A. I always wear glasses, yes.
24 Q. Okay. Generally, when you got to work back in May of 2015
25   with special ops, you were plainclothes?

Page 18

1  A. Correct.
2  Q. Okay.
3  A. Well, I was plainclothes and/or it's called a modified
4    uniform or a special operations uniform.
5  Q. And how would that modify in special ops uniform?
6  A. The special ops uniform I don't remember when it changed,
7    but it's green pants with the black Polo style shirt.
8  Q. Okay. Would you -- would you have externally your gun and
9    things like that or --
10 A. Yes.
11 Q. -- would that be under your shirt?
12 A. No, it would be out in the open. And our badges would be
13   clearly visible around our necks.
14 Q. Now, that wouldn't be the same if you were plainclothes,
15   would it?
16 A. Well, if I was in straight plainclothes, then no. I
17   wouldn't have my badge hanging out.
18 Q. Okay. And your gun would probably be concealed in some
19   manner?
20 A. Unless the only time that that would change is if that we
21   were taking police action. Then it would be exposed.
22   Everything would be exposed.
23 Q. Sure. Okay. And if you were in plainclothes if you had
24   to travel from one place to the other, I'm assuming it
25   would be unmarked vehicle?

Page 19

1  A. A UC, yes.
2  Q. And if you were in a modified special ops situation, would
3    it still be an undercover car or would it be a modified
4    car?
5  A. No, it would be a special operations car, which is an all
6    black car.
7  Q. Okay. No markings on it?
8  A. Well, no, it had -- depends I -- like I said, I don't
9    remember what car we were in, but cause that's right
10   around the time we were getting new Charges.
11 Q. Okay.
12 A. And the Charges have it's a fully marked scout car. The
13   only difference is that the light bar is underneath on
14   the top of the visor as opposed to on top of the car. It
15   says Detroit Police on the side of the vehicle.
16 Q. Sure. So do you remember this particular arrest
17   specifically?
18 A. No.
19 Q. Okay. So I'm going to see what I can do to help you.
20 A. Okay.
21 Q. Help your memory here. I'm going to show you an activity
22   log.
23 A. Okay.
24 Q. Which is always a good place to start.
25 A. Yeah.

Page 20

1        (Deposition Exhibit Nos. 1 and 2 marked for
2         identification at 12:35 p.m.)
3  Q. (BY MR. CABOT): I'm going to show you what I've labeled
4    Exhibit 1 and Exhibit 2, okay?
5  A. Okay.
6  Q. And it looks like --
7  A. May I?
8  Q. Sure. It looks like one of the exhibits is for overtime,
9    for eight hours overtime.
10 A. Mm-hm.
11 Q. And one looks like it was what we'll call the straight
12   shift, is that accurate so far?
13 A. That is correct, yes.
14 Q. So Exhibit 1 is that the overtime one or is that the
15   straight time?
16 A. That is the overtime.
17 Q. Okay. So your overtime was prior to your shift?
18 A. Correct.
19 Q. And your actual shift log was Exhibit 2 for your normal
20   hours?
21 A. That's correct.
22 Q. Okay.
23 A. From seven to three.
24 Q. The -- are you able to tell, let's look at Exhibit 1, who
25   completed Exhibit 1?

Monique Bass v.
Bomber, Todd, Murphy, and City of Detroit

Eugene Bomber

Eugene Bomber - Vol. I
October 30, 2017

Page 21

1  A. There's really no way to tell who did that.
2  Q. Okay.
3  A. Who actually filled it out.
4  Q. Okay. That is your signature at the top?
5  A. That is correct.
6  Q. Okay. Are you able to tell me who the supervisor checking
7     the log was?
8  A. Yes, Sergeant Greg Tomassini.
9  Q. Okay. That's on Exhibit 1, correct?
10 A. Correct.
11 Q. And is that different on Exhibit 2?
12 A. Yes.
13 Q. It looks like two of them reviewed it. Supervisor checked
14    the log and one reviewed it. There's two different names.
15 A. That is correct. Well, seeing as I've had to do a bunch
16    of these I can explain. The very first log entry by -- on
17    the -- this would be on Exhibit 2.
18 Q. Mm-hm.
19 A. Has the supervisor checking the log in would be Brent
20    Rodak. Now, it's different -- it's different. It's just
21    whatever supervisors there would sign it at the completion
22    of his shift. It's verifying that whoever worked those
23    hours worked those hours and when the log was turned in.
24 Q. Okay.
25 A. If that makes sense.

Page 22

1  Q. Yep. So who was the first supervisor on Exhibit 2?
2  A. Brent Rodak.
3  Q. And that's R-O-D-A-K?
4  A. That is correct.
5  Q. And so it looks like when you first came in that day, you
6     were part of platoon four and your special event was
7     restore order?
8  A. That's correct.
9  Q. What is restore order?
10 A. Restore order is it's just a name given by the chief to
11    bringing people in on their active warrants.
12 Q. Now, are those any type of warrants or are they warrants
13    for certain types of crime?
14 A. Targeted for felony warrants. The focus the idea behind
15    it was that people who typically commit felonies will
16    commit other felonies and by reducing the number of known
17    offenders within a precinct, would help reduce your crime.
18 Q. Okay. And just so I'm clear, you came in early that day.
19    So your overtime was pre your shift?
20 A. Correct.
21 Q. Okay. And was that specifically to deal with that restore
22    order issue or was it some other reason?
23 A. No, that's correct. It was specifically for restore
24    order.
25 Q. Now, was that requested like you could do that if you

Page 23

1     wanted more overtime or was it mandatory?
2  A. According to my wife, it was mandatory.
3  Q. Okay. How about according to the police department?
4  A. No, it's --
5  Q. It was volunteer?
6  A. Yes, correct, yes.
7  Q. And so when you began your shift, it looks like there was
8     some type of role call conducted by Lieutenant Cannon,
9     C-A-N-N-O-N, is that correct?
10 A. Yes.
11 Q. Okay. And would he -- is that a male or female? Do you
12    know what his or her first name was?
13 A. I don't remember.
14 Q. Okay. So we'll just say Lieutenant Cannon, would they
15    kind of go over do like a shift briefing at that point or
16    just role call simply who's there and who's not?
17 A. It really depend -- it really depended. It's the gist of
18    -- it primarily was to see who's working.
19 Q. Okay. And the second entry after the role call was the
20    vehicle inspection and video introduction by Lieutenant
21    Cannon. Do you recall what that was all about?
22 A. We just go over our -- you just have to go over vehicle
23    inspection that day before the start of your shift.
24 Q. Okay. Was that actually done with Lieutenant Cannon or --
25 A. I don't recall --

Page 24

1  Q. Okay.
2  A. -- to be honest with you.
3  Q. All right. How would you get your assignments of these
4     people with the warrants as it related to restore order?
5  A. We had a clerk -- well, an officer who was acting as a
6     clerk, Officer Angelowski.
7  Q. Okay.
8  A. Who would --
9  Q. Do you know his or her first name?
10 A. Joseph or something like that.
11 Q. So it's Angelowski?
12 A. Mm-hm.
13 Q. Is that a yes?
14 A. Yes, I apologize, yes.
15 Q. Okay. And I'm sorry. You believe his first name was
16    what?
17 A. Joseph, yeah.
18 Q. And what is Joseph -- what was his position as far as
19    these restore order and the warrants?
20 A. He would -- he would deal out the packets.
21 Q. And when you say deal out the packets, what does that
22    mean?
23 A. So basically what would happen is we would come in and
24    there would be a stack of -- pretty much a stack of known
25    offenders that we would be going after for the day. We

Monique Bass v.
Bomber, Todd, Murphy, and City of Detroit

Eugene Bomber

Eugene Bomber - Vol. I
October 30, 2017

Page 25

1   would divvy them up no rhythm or reason, no who gets what,
2   just grab some, and then make attempts to make an arrest
3   and then --
4 Q. Now --
5 A. -- hopefully get an arrest and close that out.
6 Q. Now, were all those within the 10th Precinct or would they
7   go outside?
8 A. Well, sometimes we would go out of the 10th Precinct, but
9   if a warrant originated or ended up within No. 10, then we
10   would take it.
11 Q. Okay.
12 A. It would be on our plate.
13 Q. So basically whoever shows up to do this restore order
14   that day, gets their share of the pile?
15 A. Correct.
16 Q. Of warrant?
17 A. Correct.
18 Q. Do you know who was responsible for compiling those?  Was
19   it that Mr. Angelowski or did it come from somewhere else?
20 A. I have no clue where it came from.
21 Q. Okay.  So all you know is that there would be a pile of
22   warrants and they would get divided up among the officers
23   for that day and shift?
24 A. That's correct.
25 Q. Okay.  And what would be Mr. Angelowski's role?  He would

Page 26

1   just be the one with the pile and divvy them up?
2 A. Pretty much.
3 Q. Okay.  So after you got your pile -- well, first of all,
4   do you know -- would you know how recent those warrants
5   were or --
6 A. They varied.
7 Q. Okay.
8 A. I mean it really truly varied.  Old warrants and warrants
9   that were brand new.
10 Q. Okay.  Would you have any idea if those warrants were
11   verified to be active or not?
12 A. Well, any of the warrants that we got one of the first
13   things that my partner, Johanna Todd, and I would do
14   between one of us is re-run and make sure the LEIN -- the
15   warrant's still good in LEIN.
16 Q. All right.  So you go into your overtime.  You get your
17   stack of warrants.  Then typically your partner, if you
18   were looking with Ms. Todd, one of you, her or you, would
19   re-run them in LEIN to make sure they were still active?
20 A. Correct.
21 Q. And you don't have any reason to believe you departed from
22   that normal procedure on this occasion --
23 A. No.
24 Q. -- involving Ms. Bass, correct?
25 A. Correct.

Page 27

1 Q. All right.  Looking at Exhibit 1, if I understand
2   correctly, as far as the log set forth in Exhibit 1,
3   there's nothing there dealing with Ms. Bass, is that
4   correct?
5 A. Give me a moment, I'll --
6 Q. Sure, absolutely.
7 A. -- I'll read it over.
8 Q. Absolutely.  And fortunately for all of us, it's computer
9   printed versus handwritten.
10 A. Or fortunate depending on who writes it.
11 Q. That's true.
12 A. It's -- this is redacted.  I don't see -- people's names
13   have been redacted, but I don't see anything with Ms.
14   Bass.
15 Q. Okay.  Let's get rid of that one.  We'll give that one to
16   the court reporter.  So what would happen typically then
17   after your overtime shift since this happened before your
18   normal shift?  Would you literally come back to the
19   station, clock out, and then go through another role call?
20   Like we see in Exhibit 2 or would you just stay out in the
21   field and do your thing until your shift ended?
22 A. It depends -- for us it -- in special ops, it's not like
23   the shift, but traditionally pretty self-sufficient.
24 Q. Okay.  Well, let's go to Exhibit 2.
25 A. Yeah.

Page 28

1 Q. It says on-duty role call conducted by Sergeant O'Rourke,
2   R-O-O-U-R-K-E.
3 A. That was correction.  It's O-R-O-U-R-K-E.
4 Q. Now --
5 A. Sorry.
6 Q. -- did you actually physically go to that role call?
7 A. I don't recall.
8 Q. Okay.  How would you typically do it if you did overtime
9   pre your normal shift like in a situation like this?  We
10   know you did some MDOC warrant things.  It looks like you
11   did an off-duty entry at --
12 A. May I?
13 Q. -- 2:30?
14 A. Okay.
15 Q. Okay.  So you would have been off duty at what time?
16 A. 3 o'clock.
17 Q. Okay.  And then when does Exhibit 2 indicate that you had
18   been on duty again?
19 A. 3 o'clock.
20 Q. Okay.  How come it says 18:45 on Exhibit 2?
21 A. Well, role call is always done 15 minutes before the,
22   quote on quote, start of the shift.
23 Q. Okay.
24 A. So 1900 hours would be technically the start of the shift.
25   So it would be 15 minutes prior.

Monique Bass v.
Bomber, Todd, Murphy, and City of Detroit

Eugene Bomber

Eugene Bomber – Vol. I
October 30, 2017

Page 29

1  Q. So what did you do between 3 o'clock and 7 o'clock?  If
2     your -- if your shift that you were on --
3  A. Mm-hm.  So --
4  Q. -- it looks like you ended at 3 o'clock -- well, that's in
5     the morning.  I gotcha.
6  A. Yeah.
7  Q. Never mind.  Gotcha.  That was my confusion.  So according
8     to Exhibit 2, your shift would have started when?
9  A. Exhibit 2 would have been -- the start of our shift would
10    be 1900 hours.
11 Q. Okay.  And what was your assignment that day?  It says
12    special ops.
13 A. It's just --
14 Q. At the top, right?
15 A. Correct.
16 Q. Okay.  So were you no longer doing the restore order or
17    what?
18 A. The restore order tag is only it has more to do with
19    payroll than it does anything else.  So they could know
20    cause certain -- the only reason I know this is having to
21    deal with payroll, but because a restore order is a
22    department wide thing, the overtime would be coming out of
23    a different budget.  So that has to be -- does that make
24    sense?  So that has to be on there so they can say these
25    officers worked restore order.  So then that overtime

Page 30

1     because it's an overtime spot would be taken out and paid
2     via that -- those funds instead of precinct funds.
3  Q. Okay.  But you would still do restore order work during
4     your normal eight hours?
5  A. That is correct.
6  Q. Okay.  And so when you -- and so on this one looking at
7     Exhibit 2 again, so it says you had your role call at
8     18:45 and then 1900, it says busy at DDC arrest from
9     operation restore.  So did you actually go somewhere and
10    pick up Ms. Bass or how do we get that?
11 A. I don't know.
12 Q. Let's go off the record for a second.
13            (Off the record at 12:51 p.m.)
14            (Back on the record at 12:57 p.m.)
15 Q. (BY MR. CABOT):  So we got all the exhibits with all the
16    correct pages now and we've stapled them.  So let's go
17    back to Exhibit 1 at the timeframe of 17:50.  And just so
18    that we're absolutely clear on the record, I'm going to
19    repeat some of my questions just so we're accurate.  Do
20    you recall who created -- who completed the activity log?
21 A. No, I don't.
22 Q. Okay.  And again, Exhibit 1 is your overtime hours, which
23    were the eight hours prior to your normal working shift,
24    is that correct?
25 A. That is correct.

Page 31

1  Q. Okay.  And it looks like there was some interaction with
2     my client beginning at 17:50, is that correct?
3  A. That is correct.
4  Q. Now, according to the entry, it said that there was an
5     attempt of an arrest of a Nathaniel Bass wanted for a
6     probation violation?
7  A. Mm-hm.
8  Q. And what I want to make clear now is was there also a
9     separate warrant for this Monique Bass?
10 A. That is correct.
11 Q. Okay.  So you had one warrant for Nathaniel Bass, one
12    warrant for Monique Bass, is that accurate?
13 A. That's correct.
14 Q. And where did you go to execute or attempt to execute
15    these warrants?
16 A. 2284 Longfellow.
17 Q. Okay.  That's in the City of Detroit, correct?
18 A. That is correct.
19 Q. Is that within the 10th Precinct?
20 A. I believe so, yes.
21 Q. Okay.  Did you have any idea based on the warrant or any
22    other information whether Nathaniel Bass and Monique Bass
23    were related at all?
24 A. I don't recall.
25 Q. Other than assuming?

Page 32

1  A. Yeah, just an assumption same last name.
2  Q. Okay.  Now, where in this information contained in your
3     activity log, for example, this date of birth 11-6-67,
4     that comes from where?
5  A. It would be from the warrant packet.
6  Q. Okay.  Black female that would come from the warrant
7     packet?
8  A. That's correct.
9  Q. Correct?  And this was an uttering and publishing out of
10    36th District Court, correct?
11 A. That's what it says, yes.
12 Q. Okay.  And then it has an OCA number.  What does -- what's
13    the OCA number?
14 A. Essentially, it's a warrant tracking number that's located
15    in LEIN.
16 Q. Okay.  And are you able to tell from that OCA number what
17    year the warrant was issued?
18 A. No.
19 Q. Okay.
20 A. Not that I know of.  I can't tell.
21 Q. So the last two numbers doesn't mean it was issued in '01?
22 A. I could not tell you that for sure.
23 Q. Okay.
24 A. On the actual LEIN, it will say date of entry.
25 Q. Okay.  And we'll look at that in a little bit.  So you and

Case 2:17-cv-10531-NGE-SDD   ECF No. 32-5   filed 12/22/17   PageID.249   Page 11 of 30

Monique Bass v.
Bomber, Todd, Murphy, and City of Detroit

Eugene Bomber

Eugene Bomber – Vol. I
October 30, 2017

Page 33

1   your partner would have made the location, correct?
2   A. Correct.
3   Q. Do you know if you would have been in plainclothes or the,
4     I guess, the partially?
5   A. If I could refer to the arrest report.
6   Q. Sure.
7         MR. CABOT: And we'll label the arrest report at
8     Exhibit 3.
9         (Deposition Exhibit No. 3 marked for
10            identification at 1:01 p.m.)
11  Q. (BY MR. CABOT): Is that the document you want to see?
12  A. That is correct.
13        MR. CABOT: Let the record reflect that Exhibit 3
14    is the police report. According to the report we were in
15    special ops uniform?
16  Q. And so that would be the green pants and --
17  A. Correct, black --
18  Q. -- the shirt --
19  A. -- Polo shirt.
20  Q. -- that you described earlier?
21  A. Yes.
22  Q. And you were in fully marked scout car, correct?
23  A. Correct.
24  Q. Now, since we're on Exhibit 3, let's just go through that
25    for a little bit.

Page 34

1   A. Mm-hm.
2   Q. It says you got a warrant packet for Monique Elicia Bass
3     and then it says, aka Monique Wright, W-R-I-G-H-T.
4   A. Mm-hm.
5   Q. Is that aka information that's on the warrant, the LEIN
6     information, or where would you get the also known as
7     information?
8   A. I honestly don't remember.
9   Q. Okay. And, of course, it was this warrant out of the 36th
10    District Court, and again, you don't know what year it was
11    issued, correct?
12  A. Correct.
13  Q. It says again referring to the police report that you went
14    to 2284 Longfellow, you knocked on the door, and somebody,
15    according to your report, by a Ms. Base (sic) answered the
16    door?
17  A. Bass.
18  Q. Okay. Did both you and your partner go up to the door
19    together?
20  A. I'm sorry. I'm reading just a moment please.
21  Q. Sure.
22  A. Yeah, we both definitely would have went up to the house.
23  Q. Okay. Do you recall what the first thing you did was when
24    you went up to the house other than knock on it?
25  A. Without assuming, I don't -- I don't know.

Page 35

1   Q. Okay. So let's go through what you would typically do
2     with one of these warrants. And you know it's an uttering
3     and publishing warrant. Does it matter the type of
4     warrant you're executing based upon what you do kind of
5     how you handle one?
6   A. Absolutely.
7   Q. Okay. So this would be a -- it looks like even the one
8     for Nathaniel Base -- Bass both non-violent crimes at
9     least according to the warrant, correct?
10  A. Mm-hm.
11  Q. Is that correct?
12  A. That's correct.
13  Q. Okay. So would that mean you typically go up to the house
14    and just knock on the door?
15  A. It wouldn't be just -- it wouldn't just be that simple I
16    mean obviously.
17  Q. Tell me what would do then with these types of non-violent
18    warrants then.
19  A. Typically, we like to walk around the house first and see
20    -- get an idea of what's going on.
21  Q. Okay. Do you do any type of surveillance in your car for
22    an hour or two hours?
23  A. For something like this, no.
24  Q. Okay. So you basically locate the address. Would you sit
25    out there maybe five-10 minutes to see if you saw anything

Page 36

1   occurring?
2   A. No.
3   Q. Okay. So you get out then and do a physical walk around
4     of the house?
5   A. Correct.
6   Q. And you're doing that to see what? If there's any dogs,
7     any animals, or what? What's your --
8   A. Correct.
9   Q. -- purpose?
10  A. Yes. Make -- just get a brief layout of the land in the
11    event when we knock on that front door somebody takes off
12    running out the back, which has happened just having a
13    good idea of what the layout is. If there is dogs, what's
14    going to be the safest approach for us if we got to get
15    into the backyard.
16  Q. Okay. And was there -- in this type of situation, would
17    you be both approach the door together or would one
18    approach the door and then one stay out as far as kind of
19    like a backup type situation?
20  A. I don't know what exactly we did in this particular
21    scenario.
22  Q. Okay.
23  A. I can guarantee you that both of us would not be up on the
24    porch together.
25  Q. Okay. So when it says we went to the listed address, you

Page 37

1   and your partner both did, but as far as going up and
2   knocking on the door, only one of you is going to do that?
3 A. Pretty much, yes.
4 Q. Okay. And do you remember --
5 A. Well, yeah.
6 Q. Do you remember who knocked on the door?
7 A. I don't recall.
8 Q. Okay. Who wrote the report?
9 A. It would be Officer Todd.
10 Q. Okay. And so I'm going to ask her this when it's her
11   turn, but I'll ask you now.
12 A. Okay.
13 Q. You've read police reports, right?
14 A. Mm-hm.
15 Q. Yes?
16 A. Yes.
17 Q. Hundreds, if not thousands of them, correct?
18 A. Yes.
19 Q. You understand generally how they're written, correct?
20 A. Yes.
21 Q. So if you were to read this knowing that Ms. Todd was the
22   one who wrote the report and it says we went to the listed
23   address and knocked on the door, Mrs. Bass answered the
24   door, what conclusion would you draw of who probably was
25   the one who actually went up the door and knocked on it,

Page 38

1   you or her or you don't know?
2 A. I don't know.
3 Q. Okay. But when it says I informed Ms. Bass --
4 A. Mm-hm.
5 Q. -- that would mean Ms. Todd, correct?
6 A. That would be correct.
7 Q. Since she's using the first person and she wrote the
8   report?
9 A. Correct.
10 Q. Okay. So we know at the minimum, she was at the door when
11   Ms. Bass opened the door, right?
12 A. Correct.
13 Q. But you would not have been on the porch, correct?
14 A. I didn't say that. I don't know who exactly was on the
15   porch.
16 Q. Okay. But generally, you both would not be on the porch
17   when your partner knocks, is that correct?
18 A. Correct.
19 Q. Okay. So we know at least that the first verbal
20   interaction I think we can safely say is with your partner
21   Todd and this person by the name of Bass, correct?
22 A. Can you please repeat the question?
23 Q. Yeah. The first communication was between your partner
24   and Ms. Bass, correct?
25 A. I don't know that.

Page 39

1 Q. Okay. Well, it says in the report I informed Bass that
2   she had a felony warrant and placed her into custody.
3   When it says I informed of the felony warrant, placed her
4   into custody, that generally means she handcuffed her,
5   right, or somebody handcuffed?
6 A. Somebody did, yes.
7 Q. Did you handcuff her?
8 A. I don't recall.
9 Q. So it might have been you or it might have been your
10   partner, correct?
11 A. That's correct.
12 Q. If there's not any type of struggle that is ensuing, would
13   it generally just be one officer that would handcuff
14   somebody?
15 A. Yes.
16 Q. Okay. Typically, if it's a female arrestee if there's a
17   female and a male officer, would it generally protocol be
18   the female that handcuffs or doesn't it matter?
19 A. It does not matter.
20 Q. Okay. Do you generally handcuff in front or behind?
21 A. Always behind.
22 Q. Okay. And it says you informed -- well, somebody -- your
23   partner informed Ms. Bass she had a felony warrant. She
24   was placed into custody without incident. What is without
25   incident mean to you when you read that in the police

Page 40

1   report?
2 A. That tells me that no force was used during the -- the
3   effecting of the arrest.
4 Q. Okay. But it doesn't -- would it mean that Ms. Bass
5   didn't have any questions about the arrest? Like what if
6   she would have said I think you got the wrong person,
7   that's not me, without incident doesn't mean that those
8   types of things didn't happen, correct?
9 A. That's correct.
10 Q. Okay. So without incident just means that no force had to
11   be used, nobody had to use a weapon, or any type of PBC
12   (sic) techniques or any of that stuff, right? PPCT
13   techniques?
14 A. Okay, yeah.
15 Q. No force was used?
16 A. No force was used.
17 Q. As you read this report, do you recall anything about this
18   arrest yet?
19 A. No.
20 Q. Okay. Do you recall what was done to verify that the
21   person on the paper warrant was, in fact, the person that
22   you were arresting? Do you remember anything done to
23   corroborate that?
24 A. Like I said, there's nothing extraordinary about this
25   incident.

Monique Bass v.
Bomber, Todd, Murphy, and City of Detroit

Eugene Bomber

Eugene Bomber – Vol. I
October 30, 2017

Page 41

1  Q. Okay.
2  A. I just know in past, either I get a Michigan
3      identification or a LEIN verification via picture.
4  Q. Okay. So let's go through that.
5  A. That's used --
6  Q. Let's go through those steps. You already established, at
7      least for Ms. Bass and this particular incident, you don't
8      recall the circumstances and the specific details,
9      correct?
10 A. Correct.
11 Q. Okay. Let's go generally now, okay? In a situation where
12     you have again a non-violent felony warrant situation,
13     which this is, if you make contact at the house, somebody
14     comes to the door, what's the first thing you do?
15 A. Say hi.
16 Q. Okay. Do you then ask for their name or do you say I'm
17     with the Detroit Police Department or how do you get to
18     the meat --
19 A. I obviously --
20 Q. -- of why you're there?
21 A. -- one of first things that I would do is identify myself
22     as a Detroit police officer and then I would ask, you
23     know, who they are.
24 Q. Okay. So you would ask their name?
25 A. Correct.

Page 42

1  Q. And what would you do after they -- if the name seemingly
2      matches the warrant? What would you do next?
3  A. Go in there and verify either via Michigan identification
4      card or like I said, an M -- I want to get the acronyms
5      correct on this. Secretary of State photograph.
6  Q. So a driver's license or state ID?
7  A. Correct.
8  Q. And then what would you do with those things?
9  A. If it's verified that that's the person on the warrant,
10     then they would need to be taken into custody.
11 Q. So you would -- you would look at the -- let's say it's a
12     state ID, you would look at the first, middle, and last
13     name and make sure the first, middle, and last name
14     matches that on the warrant, correct?
15 A. Typically, yes.
16 Q. Why wouldn't you?
17 A. Well --
18 Q. You say typically.
19 A. If somebody, let's say, had been married and they changed
20     their name, then their maiden name would be on the arrest
21     as opposed to their married name.
22 Q. Okay.
23 A. The warrant.
24 Q. But typically, the first and middle name wouldn't change?
25 A. Typically, yeah.

Page 43

1  Q. Okay. So you would look at the name?
2  A. Mm-hm.
3  Q. What other things would you look at as far as their photo
4      ID, state ID, and the warrant? Would you look at
5      addresses? Would you look at dates of birth?
6  A. Honestly, with -- with the way the LEIN printouts --
7      addresses from my experience change more than the weather.
8      People can have an address one day and the next week have
9      a different address.
10 Q. Mm-hm.
11 A. So things like that I typically don't look at too heavy.
12 Q. What about race?
13 A. Yes.
14 Q. Gender?
15 A. Yes.
16 Q. Height and weight?
17 A. With height and weight, a lot of times sometimes it's
18     close, other times it's way off. They'll put a general
19     statement in there sometimes like 4-11 and 50 pounds or
20     whatever the case may be.
21 Q. Mm-hm. But generally, I mean if you have a height of
22     4-11, but the person you're looking at is six foot tall --
23 A. Well, if I see 4-11, 50 pounds in there, then it would be
24     a general statement. So I wouldn't even rely on that as
25     valid information.

Page 44

1  Q. Okay. What about date of birth?
2  A. Yes.
3  Q. You would rely on that?
4  A. Correct.
5  Q. Okay. Race, gender. What about eye color?
6  A. The things that I focus on I've seen on warrants -- here's
7      the thing about LEIN and the information that we get.
8      Just like anything else, it's only as good as the person
9      putting in the information. So if somebody makes a typo
10     while they're inputting the warrant, if that makes sense.
11 Q. I understand. How often does that happen where there's a
12     typo that says male instead of female or white instead of
13     black or --
14 A. Unfortunately, more often than you would think.
15 Q. Okay. Well, what -- what happens in the situation where
16     you have this warrant packet and you go after the person
17     allegedly named in the warrant and the person says that
18     can't be me, that's not me? What do you do at that point
19     other than to say well, your name's on here, you're going
20     with me?
21 A. Well, I mean the thing about a warrant in LEIN, a warrant
22     has been signed by a prosecutor as we all know. It's been
23     signed by a Judge and it's good on its face value. I
24     would explain to them that unfortunately, at that time,
25     let's say my partner, I'm just going to -- so I'll pick on

Monique Bass v.
Bomber, Todd, Murphy, and City of Detroit

Eugene Bomber

Eugene Bomber - Vol. I
October 30, 2017

Page 45

1   her, so I don't pick on anybody.
2 Q. Sure.
3 A. If I go to her house and she's got a warrant for her
4   arrest and she's like this isn't me, I would say well,
5   ma'am, I do apologize, however, the warrant's in this
6   system and it's been signed by a Judge, there's nothing we
7   can do at this time. My department policy says that you
8   shall arrest for this warrant. Not may, shall. So
9   unfortunately, we're going to have to take you in at this
10   point. It's already gone to the point where a warrant's
11   been signed. It's out of my hands.
12 Q. Okay.
13 A. So they're going to have to go in front of a Judge and
14   then plead their case.
15 Q. And so according to the police report, she was then after
16   she was arrested, she was taken to the DDC?
17 A. That's correct.
18 Q. Detroit Detention Center?
19 A. Correct, yes.
20 Q. Let's look at your activity log now.
21 A. Mm-hm.
22 Q. Exhibit 1 and it looks like the last page is where we talk
23   about it, this incident?
24 A. Mm-hm.
25 Q. So Ms. Bass answers the door, she's taken into custody.

Page 46

1   The information about Nathaniel did you ask her where he
2   is or is he at this address or --
3 A. Like I said, I don't recall. I can just go by what's on
4   the activity log.
5 Q. Okay. And if we were to make rational assumptions from
6   the activity log, obviously, somebody would have had to
7   ask you where's Nathaniel Bass?
8 A. Yes.
9 Q. Because then she had a response that she's in the process
10   of divorcing him and she didn't know where he was at, is
11   that correct?
12 A. That's what this says, yes.
13 Q. Did she allow you in the house or do you guys --
14 A. She did.
15 Q. Okay.
16 A. According to this.
17 Q. Okay. Would you have had the authority to just go in
18   there -- in the house and look for him if he hadn't given
19   you permission?
20 A. If -- that's a tricky question. Because under certain
21   circumstances, we would.
22 Q. Okay. Under this circumstance where --
23 A. With having no idea, then the answer would be no.
24 Q. Okay. So then you take her to the DDC and it looks like
25   Exhibit 1 then goes into Exhibit 2?

Page 47

1 A. Correct.
2 Q. It says you were busy at the DDC. What does that mean?
3   Just busy with that one arrest or busy cause you had a
4   bunch of arrests you were dealing with?
5 A. It would have just been that one.
6 Q. Okay. And so describe to me the process of what you did
7   with Ms. Bass at the DDC. I'm assuming you went directly
8   from her residence to the DDC?
9 A. I'm assuming, yeah.
10 Q. Okay. There's no note that you went somewhere else?
11 A. Yeah.
12 Q. Okay. So what happens at the DDC?
13 A. So depending on who's driving, we would pull up into a
14   sally port gated area with high fenced barbed wire. Gate
15   would then close. We would then have the prisoner exit
16   the vehicle. At which time they would be searched one
17   more time.
18 Q. By you and your partner?
19 A. Correct.
20 Q. So they would have been searched at the house
21   preliminarily --
22 A. Correct.
23 Q. -- after they were cuffed?
24 A. Yes.
25 Q. Okay. And then they would be searched again at the DDC?

Page 48

1 A. Yes.
2 Q. Okay.
3 A. Then they go in through a door, one set of doors that
4   locks has to be -- you have to be buzzed in and you're led
5   into a general holding area.
6 Q. Okay.
7 A. Okay. I was just making sure. So at that point, somebody
8   would, either myself or Officer Todd, would fill out a
9   folder with the prisoner's information as well as a
10   detainee intake sheet.
11 Q. Okay. So let me stop you there.
12 A. Sorry.
13 Q. So we had in your colleague's last deposition we marked as
14   exhibits. She didn't really know what we were, but you
15   mentioned a couple things that now struck my curiosity.
16   You said one of the first things you do is fill out a
17   folder?
18 A. Correct.
19 Q. I'm going to show you Exhibit 1 from Defendant Murphy's
20   deposition. Is that like the cover of the folder of which
21   you're speaking about? And that would be Exhibit 1 to Ms.
22   Murphy's deposition.
23 A. That looks like a stamp. Whether this is a copy of the
24   actual folder I don't know.
25 Q. Okay. But when you say folder, it is an actual folder?

Monique Bass v.
Bomber, Todd, Murphy, and City of Detroit

Eugene Bomber

Eugene Bomber – Vol. I
October 30, 2017

Page 49

1  A. Yes.
2  Q. And that information that's in Exhibit 1 to Murphy's
3      deposition is stamped on the folder typically, correct?
4  A. Correct.
5  Q. Okay. Do you recognize the handwriting in that document?
6  A. No, I don't.
7  Q. Okay. And then you said the second thing you do is you
8      would complete the detainee input sheet, correct?
9  A. Correct.
10 Q. And for the record, this was Exhibit 2 to Defendant
11     Murphy's deposition. Do you recognize any of the
12     handwriting on that document?
13 A. May I?
14 Q. Sure.
15 A. No, I don't.
16 Q. Okay. Does it even appear to be yours?
17 A. I don't think so.
18 Q. Okay. All right. So but you or your partner would fill
19     out the information on that folder contained in Murphy
20     Exhibit 1, correct?
21 A. That is correct.
22 Q. And then you or your partner would complete looks like
23     about half of the detainee input sheet, is that correct?
24     At least the top half?
25 A. We would complete not even the top half. Things like the

Page 50

1  SID Number, CB number, ID number, and the TCM lot --
2      live-scan number would not be filled in by us.
3  Q. Okay. But you would fill in --
4  A. We would fill in the names all this information up here.
5  Q. Okay. So for the record, you would fill in last name,
6      first name, middle name, hair color, eye color, aliases,
7      driver's license, or social security number information,
8      age, sex, race, date of birth, complexion, height,
9      address, city, state, zip, marital status, weight, scars
10     tattoos, correct, so far?
11 A. Correct.
12 Q. That's what you or your partner would have done?
13 A. Correct.
14 Q. And then kind of the second quarter of that talks about
15     medical mental issues. Would you guys have filled that in
16     too?
17 A. Yes.
18 Q. Okay. And then going down about halfway, it talks about
19     arresting officer, the badge, the assignment code, last
20     three of your pension number, all that. Is that stuff
21     that you would fill in?
22 A. Yeah.
23 Q. You or your partner?
24 A. Yes.
25 Q. Okay. And then it says supervisor signature. Do you

Page 51

1  remember -- do you recognize that signature?
2  A. No, I don't.
3  Q. Okay. And then once it gets to the hold and fugitive
4      warrants, that's somebody else, and Murphy already said
5      she did that?
6  A. Yeah, so they would take it and then run -- re-run the
7      information through LEIN or TALON.
8  Q. Okay. So you fill out the folder with what information?
9      Are you getting -- are you filling it out from the LEIN
10     information or are you verbally asking the arrestee?
11 A. From her.
12 Q. Okay. So you're verbally asking for this information?
13 A. Yes.
14 Q. For the folder and the detainee input sheet?
15 A. Well, the height, weight questions would be getting from
16     her.
17 Q. Okay. Where would you getting dates of birth, sex,
18     addresses?
19 A. Either from her directly or from Michigan state ID.
20 Q. Okay. And in this case, do you remember what you did?
21 A. I don't -- I don't recall.
22 Q. Okay. So I would assume that the file folder comes first,
23     correct, completing that because you got to put something
24     in it, right? Is that just the file thing generally the
25     first thing that you complete?

Page 52

1  A. It may or may not be.
2  Q. Okay.
3  A. Depending if there's a file folder there.
4  Q. Okay. So if there isn't one, that's generally the first
5      thing you'll complete if there isn't one already made?
6  A. It depends.
7  Q. Okay. But is that and the detainee input sheet one of the
8      first two things you'll do?
9  A. Once we get to the DDC --
10 Q. Yes.
11 A. -- that is correct.
12 Q. Okay. What do you do with those items then?
13 A. We hand it to the people so when you get there, there's a
14     separation between which would be essentially the
15     supervisor, the desk supervisor of the Detroit Detention
16     Center and the people running TALON and LEIN. So it's
17     separated by what appears to be bulletproof glass and a
18     window. So we give them that information. They take the
19     folder. They then give us copies of some paperwork to go
20     back with the prisoner. Prisoners then taken to the first
21     stage which is where they're basically searched by DPD
22     officers or they now have I think it's civilians almost.
23 Q. But you don't do that?
24 A. No.
25 Q. Okay.

Page 53

1  A. No.
2  Q. So in this case, we know that Ms. Murphy completed section
3     two of the holds and fugitive warrant --
4  A. Correct.
5  Q. -- part of the detainee input sheet. So for her to have
6     gotten that, was that something you would physically given
7     to her or would that go through somebody else and
8     eventually end up to her?
9  A. We provide the information with a name, date of birth, and
10    stuff like that, and they run the name through TALON.
11 Q. Okay. But would you give her any of those exhibits,
12    Exhibit 1 or 2 of her deposition?
13 A. Yes, the detainee intake sheet --
14 Q. Right.
15 A. -- the folder would be given directly to her.
16 Q. To Ms. Murphy?
17 A. Or whoever is being --
18 Q. Or whoever is doing it?
19 A. Yes.
20 Q. And generally, where is the arrestee at this point when
21    you're filling out the folder and the sheet?
22 A. Sitting in a large room kind of referred to as bullpen
23    waiting to be further processed.
24 Q. Are they close enough to where if you had a question, you
25    could easily get to them or no?

Page 54

1  A. Yeah.
2  Q. Okay. After the sheet is given to, in this case Ms.
3     Murphy, do you know what happens to the paperwork after
4     that? Does it come back to you or --
5  A. I have no idea.
6  Q. All right. So you don't know what happens after that?
7  A. No.
8  Q. Has there ever been occasion where you've given a file
9     folder information, the detainee input sheet to the person
10    who completes the fugitive hold section and they had
11    questions for you? Has that ever happened?
12 A. Not that I can recall.
13 Q. Okay. Has anybody if you've arrested somebody on a
14    fugitive hold given that information then to the fugitive
15    hold checker and that person say I don't even see that
16    this person has a hold on them in LEIN? Has that ever
17    happened?
18 A. Not that I can recall.
19 Q. Okay. Is it possible that could happen?
20 A. Is it possible?
21 Q. Yeah.
22 A. Yeah.
23 Q. How could that happen?
24 A. If say if somebody gets one of these packets and doesn't
25    verify it and that person has been since arrested at the

Page 55

1     completion of those packets, which is why my partner --
2     either my partner and I would re-verify that information
3     in TALON or LEIN prior to us making arrest attempts.
4  Q. So what would you say the timeframe of your verification
5     was between the verification and the actual arrest of Ms.
6     Bass?
7  A. It would be that day.
8  Q. Okay. Did she ever dispute with you that she had a
9     warrant or did she ever indicate to you that's not me or
10    anything like that?
11 A. I don't recall.
12 Q. Okay. So you don't know one way or the other?
13 A. No.
14 Q. Okay. After you complete the folder, the detainee input
15    sheet generally, what do you do next? Just go onto your
16    next assignment or what?
17 A. Once she's been processed and once --
18 Q. Well, do you stay there for the processing of her?
19 A. We -- we are there for a portion. So once we exit the --
20    we'll call it the bullpen area. They go into the first
21    set of doors where they're doubled checked and if they
22    have any amounts of cash over I believe it's $9.75, then
23    it will be then put into a machine the Kiosis, they would
24    get that money. Once she's been processed initially,
25    there's no fingerprinting or anything like that that takes

Page 56

1     place at that point. Once she's been scanned, an initial
2     scan, we then walk her or the prisoner at that point to
3     building 500, which is located across the courtyard.
4     Depending on if they're male or female depends on which
5     door we go into. Once we go into -- judging by the
6     gender, we'll go into a door. We then hand the prisoner
7     off to the Michigan Department of Corrections. Michigan
8     Department of Corrections then takes custody of the
9     prisoner. So we give them the information, they ask a
10    series of questions, it's all intake questions as far as
11    medical, anything like that. If they don't have any
12    medical issues, we're then excused, and then they fully
13    take custody of that prisoner.
14 Q. Okay. So you're present during all that?
15 A. Correct.
16 Q. And at any time during that process, do you recall whether
17    or not Ms. Bass said I'm not the person on the warrant or
18    made any type of statements along those lines or don't you
19    recall?
20 A. I honestly don't recall.
21 Q. Okay. If she had made those statements, would that
22    something you would normally put either in the arrest
23    report or the activity log or do you hear that all the
24    time such that you don't really pay attention?
25 A. I hear it all the time.

Monique Bass v.
Bomber, Todd, Murphy, and City of Detroit

Eugene Bomber

Eugene Bomber - Vol. 1
October 30, 2017

Page 57

1  Q. So it's not something you would note?
2  A. No.
3  Q. Okay. No, that's correct, it's not something you would
4     normally note, is that correct?
5  A. That is correct.
6  Q. Okay. The warrant that you get does it have a picture on
7     it?
8  A. No.
9  Q. Okay. So there's no way to physically match the arrestee
10    to the person on the warrant other than these printed
11    things that's on the warrant, is that correct?
12 A. Other than the information that's present on the warrant,
13    no.
14 Q. Okay. So we have a copy of the warrant, which we'll label
15    as Exhibit 4.
16            (Deposition Exhibit No. 4 marked for
17            identification at 1:32 p.m.)
18 Q. (BY MR. CABOT): Now, I'm going to show you what's been
19    provided to me today as the LEIN information with some
20    redactions on it.
21 A. Okay.
22 Q. My question to you is the form of it is that generally
23    what would get with these warrant packets that you've been
24    talking about?
25 A. That is correct.

Page 58

1  Q. Okay. And so it's generally just what? A two-page or
2     one-page document? Cause that's all I got. So is that
3     normally in these warrant packets?
4  A. Pretty much, yes.
5  Q. Okay. When you --
6  A. There might -- well, there would be -- there may be a
7     Secretary of State printout with it.
8  Q. Okay. And would that Secretary of State have a photo on
9     it or what would be the purpose of the Secretary of State
10    printout?
11 A. With information.
12 Q. Okay. I'm going to go over this with you, and again, we
13    just have the one copy here. So -- oh, okay.
14 A. Just so you can verify it's the same information.
15 Q. Okay. That's fine. So the first -- second line it says A
16    LEIN, A space L-E-I-N. What's that line mean?
17 A. Just referenced the system.
18 Q. Okay. And so it says 10-30-17. So does that mean you
19    printed this out today or somebody did?
20 A. Somebody did, yes.
21 Q. Do you know who did?
22 A. The operator would be Quinn Johnson.
23 Q. Okay. Do you know who Quinn Johnson is?
24 A. JJ, yes, at 10 PDU.
25 Q. Okay. Did somebody ask him to print this out?

Page 59

1  A. Yes.
2  Q. Okay. Who did?
3  A. It was a combination of myself and I think I asked Todd to
4     do it.
5  Q. Okay. So but -- so this -- but would this document be the
6     same thing that you would have seen back in May of 2015?
7  A. Similar.
8  Q. Okay. What --
9  A. Well, that's -- well, here's the thing with this. If you
10    look obviously we're here for Ms. Monique Bass, aka
11    Monique Wright, a Monique Wright is her maiden name.
12 Q. Mm-hm.
13 A. If you look at the bottom of this where it says the
14    offense for felony or forgery of checks, the date of
15    warrant, which is the date this warrant was issued, was on
16    November 13th of 2000, okay?
17 Q. Okay. That's DOW?
18 A. DOW is date of warrant.
19 Q. Yep.
20 A. The OCA is next to it.
21 Q. And what's that mean?
22 A. That's -- it's a reference number.
23 Q. Okay.
24 A. Okay? Where the court -- what court it's out of which in
25    this case it's 36th District Court. It will have some

Page 60

1     additional information like how far will they pick up. In
2     this case, they will pick up statewide and the remarks
3     here court canceled. Now, it says entered into LEIN on
4     the bottom. So underneath the ORI number, okay?
5  Q. Mm-hm.
6  A. It says date entered into LEIN, which is January 9th of
7     2001.
8  Q. Mm-hm.
9  A. And it will give you the time it was changed, 2100 hours.
10 Q. Mm-hm.
11 A. This warrant was modified on August 8th of 2015 at 02:09
12    hours.
13 Q. Mm-hm.
14 A. Okay? Which means that some of the information that's
15    within what you see was changed.
16 Q. Okay.
17 A. So I couldn't tell you what was changed in there, just
18    some of the information. Could be name, could be date of
19    birth, it could be any of these characteristics was
20    changed. All this tells me is that whoever this person is
21    that changed it, changed that on August 8th of 2015.
22 Q. And who changed it?
23 A. I have no clue.
24 Q. Okay. So if I wanted to get the actual copy of the
25    warrant that you saw --

Monique Bass v.
Bomber, Todd, Murphy, and City of Detroit

Eugene Bomber

Eugene Bomber – Vol. I
October 30, 2017

Page 61

1   A. Right.
2   Q. -- in May of 2015, where do I get that?
3   A. That's another great question.
4   Q. That's three great ones.
5   A. That's three great ones.  I don't know.
6   Q. What do you do with the warrant when you're done with it,
7       the printout?
8   A. It's -- once -- I mean it's in the system.  If it's -- it
9       depends on what type of warrant we're talking about.
10  Q. But you had a physical piece of paper?
11  A. It's a printout from LEIN.
12  Q. Right.
13  A. That's all that we had.
14  Q. But what did you do -- what would you typically do with it
15      once that arrest is made?
16  A. It would be in the burn pile.
17  Q. And when you say burn pile, that literally means you shred
18      it?
19  A. You shred it or burn it, yes.
20  Q. Okay.  All right.  Let's look back at Exhibit 4 a little
21      bit.  It says remarks court canceled.  What does that mean
22      generally?
23  A. It was canceled by the court would be my best guess.
24  Q. Okay.  As you look at this document, do you know when the
25      court canceled it?

Page 62

1   A. I do not -- well, it says canceled on June the 1st of
2       2017.
3   Q. Okay.  So you have to go down or would that mean that the
4       court canceled it or that the LEIN was canceled, that's
5       what that means?
6   A. I -- I don't know.  I can tell you according to this
7       paper, this says it was canceled on June 1st, 2017 at
8       10:26 a.m. by operator Floyd K, whoever he is or she is.
9   Q. But that would be at the court?
10  A. That would be correct.
11  Q. Okay.  But as far as the information contained, this has
12      the date of birth, the weight, height, you would verify
13      all this with the person you got in front of you or with
14      an ID card?
15  A. Correct.
16  Q. Okay.  Let's go to the upper half.
17  A. Mm-hm.
18  Q. Next to the redactions it says SMT and then SCR knee.
19      Does that mean scar right knee?  Do you see where I'm at?
20      Right here.
21  A. That's somebody different.
22  Q. What do you mean somebody different?
23  A. So what happens when you run somebody's name is that
24      because unfortunately people do lie about their names,
25      that anything remotely resembling their name will come up,

Page 63

1       okay?  So, for instance, if you say your name is William
2       Brown, very common name, and you gave a date of birth.
3       Any name associated with William Brown will pop up.
4   Q. Okay.
5   A. So it's not necessarily this is going to be her.
6   Q. Well, this says Monique Wright?
7   A. Okay.
8   Q. So my question --
9   A. Where?
10  Q. It says it right at the top.
11  A. Well, no.
12  Q. R-E see?
13  A. Yes, that's -- okay, regarding that's the inquiry that was
14      made.
15  Q. Okay.
16  A. So whoever -- so Detective Johnson ran this is name that
17      came back.  So any -- so he runs a name, now all this
18      stuff would come up after the fact.  Does that make sense?
19  Q. No.  Let's go off the record.
20          (Off the record at 1:40 p.m.)
21          (Back on the record at 1:41 p.m.)
22  Q. (BY MR. CABOT):  So the un redacted -- we have an un
23      redacted copy and we have the redacted copy.
24  A. Correct.
25  Q. The redacted copy is what's Exhibit 4.  So my

Page 64

1       understanding is whoever the operate -- whoever did the
2       LEIN, which was Johnson?
3   A. Correct.
4   Q. Quinn Johnson, he put in as the search term Monique
5       Wright?
6   A. Correct.
7   Q. And when he put in Monique Wright, there's some other
8       people who came up?
9   A. That's correct.
10  Q. The first set of redactions would be somebody not named
11      Monique Wright, but actually was named somebody totally
12      different?
13  A. Correct.
14  Q. Then we go down and so all that information, the
15      misdemeanor for trespassing, that's related to the name
16      that's been redacted, correct?
17  A. That is correct, yes.
18  Q. So then we come to the part of Exhibit 4 where we have
19      some asterices?
20  A. Correct.
21  Q. And that is where Monique Wright actually matches to the
22      name put in?
23  A. That's correct.
24  Q. Can you explain to me why when you put in Monique Wright,
25      you first get the name of this person who I can just say

Monique Bass v.
Bomber, Todd, Murphy, and City of Detroit

Eugene Bomber

Eugene Bomber – Vol. I
October 30, 2017

---

Page 65

1  for the record doesn't have a Monique in her name, a
2  Wright in her name, or the --
3  A. Okay.
4  Q. -- any name of her name that's related to Monique Wright?
5  Can you explain that?
6  MS. REHMAN-BARTON: Do you want to go off the
7  record for one second?
8  MR. CABOT: Well, let's see if he can --
9  MS. REHMAN-BARTON: Okay.
10 MR. CABOT: -- answer that question --
11 MS. REHMAN-BARTON: Yeah, I'm sorry.
12 MR. CABOT: -- first.
13 MS. REHMAN-BARTON: Yes, you're right.
14 A. Okay. Yes, so there could be a number of -- there could
15 be a number of reasons. I don't know all the criteria for
16 what links the person's name. It could be their social
17 security numbers are close or it could be their date of
18 birth is close or it could be that somebody used an alias
19 of this person's name in an arrest. It could be one of
20 infinite amount of things that somehow is links whoever
21 else to this person.
22 Q. (BY MR. CABOT): Okay.
23 A. It's just a possibility that this could be him.
24 Q. Okay.
25 MS. REHMAN-BARTON: Can we go off the record for

Page 66

1  one second?
2  MR. CABOT: Sure.
3  (Off the record at 1:43 p.m.)
4  (Back on the record at 1:43 p.m.)
5  Q. (BY MR. CABOT): So the first thing I see under the
6  operator's name at the top though it says caution caution
7  colon other?
8  A. Mm-hm.
9  Q. What does that mean?
10 A. That means that somebody -- somebody either the target
11 name that was ran or a name associated with the target
12 name is wanted for a felony or has been previously
13 convicted of some type of violent crime.
14 Q. Okay. Now, the warrant you got, would it have had,
15 looking at Exhibit 4, this upper half of that information
16 this other person's name and all that? Would that have
17 been on the warrant you actually physically got on the day
18 of this incident?
19 A. I really don't remember --
20 Q. Okay.
21 A. -- the initial thing. It's just -- it's extremely
22 possible that other people's information would have been
23 in there as well.
24 Q. So then how much of this information would you have had on
25 Exhibit 4 other than her name, her race, her hair, her

Page 67

1  address, and then the offense, the OCA, and date of the
2  warrant, the court, the pick up? I mean obviously, you
3  wouldn't have gotten remarks court canceled that day
4  because you're saying it wasn't canceled that day.
5  A. Well, it wasn't canceled that day according to this.
6  Q. So what other information would you --
7  A. If it was a canceled warrant, she would have never been
8  arrested.
9  Q. But what other information would have been listed on
10 there?
11 A. Aside from her name, date of birth --
12 Q. Right.
13 A. -- address, that sort of thing?
14 Q. Right, the court, you know, the pick up and all that?
15 A. Yes, and the nature of the charge, the OCA of the charge,
16 and the date of warrant that would have been it pretty
17 much.
18 Q. Okay.
19 A. It looks similar to this. Like I said previously stated,
20 according to this, it was modified on August 8th of 2015.
21 So the information within this warrant would have been
22 modified on that date.
23 Q. Okay.
24 A. By the courts.
25 Q. Okay. Did you ever receive any information from any

Page 68

1  source that the person that was the subject of this
2  warrant wasn't the correct person?
3  A. I don't believe so. I -- honestly, I don't remember this.
4  Q. Okay. I'm going to show you what we're going to label as
5  Exhibit 5.
6  (Deposition Exhibit No. 5 marked for
7  identification at 1:46 p.m.)
8  Q. (BY MR. CABOT): Show you what's labeled Exhibit 5, which
9  is called an incident report, is that any different from
10 the official arrest report or is that just something extra
11 that's done? It's a different form.
12 A. I've never seen this form.
13 Q. You've never seen Exhibit 5?
14 A. No, it appears to me like the CRISNET report, but I've
15 never seen this form.
16 Q. Okay. And who is Sergeant Richard Knox from the 8th
17 Precinct?
18 A. I don't know who that is.
19 Q. Okay. I'm going to show you what we're going to label as
20 Exhibit 6.
21 (Deposition Exhibit No. 6 marked for
22 identification at 1:49 p.m.)
23 Q. (BY MR. CABOT): Which is a mugshot report and just ask
24 you if that photograph jogs your memory if that was the
25 person you arrested?

---

Monique Bass v.
Bomber, Todd, Murphy, and City of Detroit

Eugene Bomber

Eugene Bomber - Vol. I
October 30, 2017

---

Page 69

1 A. No clue.
2 Q. Okay. Do you ever ask the people who you arrest if
3    they're employed or anything like that or --
4 A. If I'm doing an interrogation, then yes.
5 Q. Okay. You didn't do that in this case, correct?
6 A. That is correct.
7 Q. Did you ever have to attend any type of court hearing on
8    this case?
9 A. I don't remember.
10 Q. I got to ask the questions.
11 A. Yeah, I don't remember.
12 Q. I kind of assume I know what your answer's going to be,
13    but I got to ask it nonetheless. Were you present during
14    the fingerprinting process?
15 A. No.
16 Q. And again, I know what your answers probably going to be,
17    but I got to ask the question any way. Looking at Exhibit
18    7, this person by the name of Monique Elicia, E-L-I-C-I-A,
19    Wright of 2284 Longfellow does that look like the person
20    that you arrested?
21 A. I -- I don't know.
22 Q. Okay.
23 A. Yeah.
24 Q. And the same question for --
25        (Deposition Exhibit No. 8 marked for

---

Page 70

1        identification at 1:52 p.m.)
2 Q. (BY MR. CABOT): -- Exhibit 8?
3 A. I do not know.
4 Q. Okay. And this was produced during discovery of the case.
5    I'm just going to ask do you know what it is if you can
6    explain it to me. This we'll label as Exhibit 9.
7        (Deposition Exhibit No. 9 marked for
8        identification at 1:52 p.m.)
9 Q. (BY MR. CABOT): Ask you if you've ever seen a document
10    like that before?
11 A. I have, yes, I mean I've seen documents like this before.
12 Q. And that looks like something from the Secretary of State?
13 A. That would be correct.
14 Q. Okay. And what generally is the information you gleaned
15    from that?
16 A. Amongst other things if they have indeed have a valid
17    driver's license. If they're eligible for a driver's
18    license. A name of the person with a date of birth and
19    such like that as well as previous names used.
20 Q. What if the warrant has somebody with a middle name? I
21    mean is that -- the middle name either doesn't exist or
22    it's different on the actual person that you're arresting,
23    does that have any bearing to you? As maybe that may not
24    be the person that's the subject of the warrant?
25 A. It would have to depend on the individual set of

---

Page 71

1    circumstances.
2 Q. And in this case, you don't know if there was an issue
3    with that, is that correct?
4 A. That is correct.
5 Q. All right.
6        MR. CABOT: I don't have anything further at this
7    time.
8            EXAMINATION
9 BY MS. REHMAN-BARTON:
10 Q. I just want the record to be clear why did you arrest
11    Monique Bass?
12 A. Based on her fugitive or felony warrant.
13        MS. REHMAN-BARTON: Thank you.
14        MR. CABOT: All right.
15            (Deposition concluded at 1:54 p.m.)
16
17
18
19
20
21
22
23
24
25

---

Monique Bass v.
Bomber, Todd, Murphy, and City of Detroit

Eugene Bomber

Eugene Bomber –  Vol. I
October 30, 2017

**$**

**$9.75 (1)**
55:22

**0**

**01 (1)**
32:21
**02:09 (1)**
60:11
**05 (1)**
13:12

**1**

**1 (17)**
20:1,4,14,24,25;21:9;
27:1,2;30:17,22;45:22;
46:25;48:19,21;49:2,20;
53:12
**1:01 (1)**
33:10
**1:32 (1)**
57:17
**1:40 (1)**
63:20
**1:41 (1)**
63:21
**1:43 (2)**
66:3,4
**1:46 (1)**
68:7
**1:49 (1)**
68:22
**1:52 (2)**
70:1,8
**1:54 (1)**
71:15
**10 (2)**
25:9;58:24
**10:26 (1)**
62:8
**10-30-17 (1)**
58:18
**10th (7)**
13:3,6,16;14:4;25:6,8;
31:19
**11-6-67 (1)**
32:3
**12:12 (1)**
4:3
**12:20 (2)**
10:25;11:1
**12:35 (1)**
20:2
**12:51 (1)**
30:13
**12:57 (1)**
30:14
**13th (1)**
59:16

**15 (2)**
28:21,25
**17:50 (2)**
30:17;31:2
**18:45 (2)**
28:20;30:8
**1900 (3)**
28:24;29:10;30:8
**1997 (1)**
11:3
**1st (2)**
62:1,7

**2**

**2 (16)**
20:1,4,19;21:11,17;
22:1;27:20,24;28:17,20;
29:8,9;30:7;46:25;
49:10;53:12
**2:30 (1)**
28:13
**2000 (1)**
59:16
**2001 (1)**
60:7
**2005 (2)**
9:20;12:3
**2015 (14)**
4:22;8:12;13:14,16;
14:6,15;15:5,12;17:24;
59:6;60:11,21;61:2;
67:20
**2017 (4)**
4:2;12:25;62:2,7
**2100 (1)**
60:9
**21st (1)**
15:12
**2284 (3)**
31:16;34:14;69:19
**22nd (1)**
15:12
**230 (1)**
17:6
**2nd (1)**
12:21

**3**

**3 (9)**
15:18;28:16,19;29:1,
4;33:8,9,13,24
**30 (1)**
4:2
**36th (3)**
32:10;34:9;59:25

**4**

**4 (7)**
57:15,16;61:20;63:25;
64:18;66:15,25

**4-11 (3)**
43:19,22,23

**5**

**5 (4)**
68:5,6,8,13
**50 (2)**
43:19,23
**500 (1)**
56:3

**6**

**6 (2)**
68:20,21

**7**

**7 (3)**
15:17;29:1;69:18

**8**

**8 (2)**
69:25;70:2
**8th (4)**
60:11,21;67:20;68:16

**9**

**9 (2)**
70:6,7
**90 (1)**
11:11
**96 (1)**
14:8
**9th (1)**
60:6

**A**

**able (3)**
20:24;21:6;32:16
**absent (1)**
16:7
**absolutely (4)**
27:6,8;30:18;35:6
**academy (4)**
9:16,19;11:25;12:1
**accompany (1)**
5:12
**According (12)**
23:2,3;29:7;31:4;
33:14;34:15;35:9;45:15;
46:16;62:6;67:5,20
**accurate (3)**
20:12;30:19;31:12
**acronyms (1)**
42:4
**across (1)**
56:3
**acting (1)**

**24:5**
**action (1)**
18:21
**active (3)**
22:11;26:11,19
**activity (8)**
8:4;19:21;30:20;32:3;
45:20;46:4,6;56:23
**actual (8)**
11:11;20:19;32:24;
48:24;25;55:5;60:24;
70:22
**actually (10)**
5:8;11:12;21:3;23:24;
28:6;30:9;37:25;64:11,
21;66:17
**additional (1)**
60:1
**address (9)**
35:24;36:25;37:23;
43:8,9;46:2;50:9;67:1,
13
**addresses (3)**
43:5,7;51:18
**administration (1)**
11:18
**advancement (1)**
9:2
**Affair's (1)**
10:10
**afternoon (2)**
4:18,19
**again (10)**
15:24;28:18;30:7,22;
34:10,13;41:12;47:25;
58:12;69:16
**against (1)**
9:22
**age (1)**
50:8
**agreement (1)**
4:15
**aka (4)**
13:6;34:3,5;59:10
**alias (1)**
65:18
**aliases (1)**
50:6
**allegedly (1)**
44:17
**allow (1)**
46:13
**allows (1)**
6:13
**almost (1)**
52:22
**along (2)**
8:25;56:18
**always (6)**
5:9;17:9,23;19:24;
28:21;39:21
**among (1)**
25:22

**Amongst (1)**
70:16
**amount (1)**
65:20
**amounts (1)**
55:22
**and/or (1)**
18:3
**Angelowski (3)**
24:6,11;25:19
**Angelowski's (1)**
25:25
**animals (1)**
36:7
**answered (2)**
34:15;37:23
**answer's (2)**
6:13;69:12
**anticipate (1)**
6:10
**apologize (2)**
24:14;45:5
**appear (1)**
49:16
**appears (2)**
52:17;68:14
**approach (3)**
36:14,17,18
**approximate (1)**
17:5
**area (4)**
14:4;47:14;48:5;55:20
**around (4)**
18:13;19:10;35:19;
36:3
**arrest (22)**
19:16;25:2,5;30:8;
31:5;33:5,7;40:3,5,18;
42:20;45:4,8;47:3;55:3,
5;56:22;61:15;65:19;
68:10;69:2;71:10
**arrested (6)**
45:16;54:13,25;67:8;
68:25;69:20
**arrestee (4)**
39:16;51:10;53:20;
57:9
**arresting (3)**
40:22;50:19;70:22
**arrests (4)**
9:14,15;10:3;47:4
**Aside (1)**
67:11
**assigned (3)**
13:4,5,16
**assignment (4)**
13:23;29:11;50:19;
55:16
**assignments (1)**
24:3
**associated (2)**
63:3;66:11
**assume (4)**

Monique Bass v.
Bomber, Todd, Murphy, and City of Detroit

Eugene Bomber

Eugene Bomber – Vol. I
October 30, 2017

6:2;12:18;51:22;69:12
**assuming (5)**
18:24;31:25;34:25;
47:7,9
**assumption (1)**
32:1
**assumptions (1)**
46:5
**asterices (1)**
64:19
**attempt (2)**
31:5,14
**attempts (2)**
25:2;55:3
**attend (2)**
11:6;69:7
**attention (2)**
15:8;56:24
**attorney (2)**
7:2,7
**attorneys (4)**
4:20;5:16;6:19;7:5
**audio (1)**
8:9
**August (3)**
60:11,21;67:20
**authority (1)**
46:17
**aware (1)**
8:10

**B**

**B&E's (1)**
14:3
**back (24)**
4:22;8:11,15;9:20;
11:1;13:14;15:5;17:5,8,
12,13,18,24;27:18;
30:14,17;36:12;52:20;
54:4;59:6;61:20;63:17,
21;66:4
**background (1)**
10:15
**backup (1)**
36:19
**backyard (1)**
36:15
**badge (2)**
18:17;50:19
**badges (1)**
18:12
**bar (1)**
19:13
**barbed (1)**
47:14
**Base (2)**
34:15;35:8
**based (3)**
31:21;35:4;71:12
**basically (4)**
24:23;25:13;35:24;
52:21

**Bass (31)**
4:21;15:9;26:24;27:3,
14;30:10;31:5,9,11,12,
22,22;34:2,17;35:8;
37:23;38:3,11,21,24;
39:1,23;40:4;41:7;
45:25;46:7;47:7;55:6;
56:17;59:10;71:11
**beard (1)**
17:19
**bearing (1)**
70:23
**began (1)**
23:7
**beginning (1)**
31:2
**behind (3)**
22:14;39:20,21
**best (2)**
6:12;61:23
**birth (12)**
32:3;43:5;44:1;50:8;
51:17;53:9;60:19;62:12;
63:2;65:18;67:11;70:18
**bit (4)**
5:7;32:25;33:25;61:21
**black (5)**
18:7;19:6;32:6;33:17;
44:13
**BOMBER (3)**
4:5,12,14
**both (7)**
34:18,22;35:8;36:17,
23;37:1;38:16
**bottom (2)**
59:13;60:4
**Boulevard (2)**
14:10,12
**brand (1)**
26:9
**break (3)**
6:4,5,8
**Brent (2)**
21:19;22:2
**brief (1)**
36:10
**briefing (1)**
23:15
**bringing (1)**
22:11
**brown (3)**
17:9;63:2,3
**budget (1)**
29:23
**building (1)**
56:3
**bulletproof (1)**
52:17
**bullpen (2)**
53:22;55:20
**bunch (4)**
4:23;12:9;21:15;47:4
**bureau (1)**

13:8
**burglaries (1)**
14:3
**burn (3)**
61:16,17,19
**business (1)**
11:18
**busy (4)**
30:8;47:2,3,3
**buzzed (1)**
48:4

**C**

**CABOT (26)**
4:10,13,18,20;7:23;
10:24;11:2;20:3;30:15;
33:7,11,13;57:18;63:22;
65:8,10,12,22;66:2,5;
68:8,23;70:2,9;71:6,14
**call (10)**
20:11;23:8,16,19;
27:19;28:1,6,21;30:7;
55:20
**called (5)**
15:17,19,23;18:3;68:9
**came (5)**
22:5,18;25:20;63:17;
64:8
**can (22)**
5:6,8,12;19:19;21:16;
29:24;36:23;38:20,22;
43:8;45:7;46:3;54:12,
18;58:14;62:6;64:24,25;
65:5,8,25;70:5
**canceled (12)**
60:3;61:21,23,25;
62:1,4,4,7;67:3,4,5,7
**Cannon (4)**
23:8,14,21,24
**C-A-N-N-O-N (1)**
23:9
**car (9)**
19:3,4,5,6,9,12,14;
33:22;35:21
**card (2)**
42:4;62:14
**career (1)**
8:21
**cars (2)**
8:11,15
**case (13)**
6:5,23;43:20;45:14;
51:20;53:2;54:2;59:25;
60:2;69:5,8;70:4;71:2
**cash (1)**
55:22
**Cathy (1)**
10:22
**Caucasian (1)**
17:2
**cause (4)**
19:9;29:20;47:3;58:2

**caution (2)**
66:6,6
**CB (1)**
50:1
**Center (2)**
45:18;52:16
**certain (1)**
22:13;29:20;46:20
**certification (2)**
12:7,11
**certifications (1)**
12:8
**certified (1)**
12:5
**chain (1)**
10:5
**change (6)**
14:18,21;15:7;18:20;
42:24;43:7
**changed (9)**
18:6;42:19;60:9,15,
17,20,21,21,22
**characteristics (1)**
60:19
**charge (2)**
67:15,15
**Charges (2)**
19:10,12
**checked (2)**
21:13;55:21
**checker (1)**
54:15
**checking (2)**
21:6,19
**checks (1)**
59:14
**chief (1)**
22:10
**circumstance (1)**
46:22
**circumstances (3)**
41:8;46:21;71:1
**citizen (1)**
9:21
**City (2)**
31:17;50:9
**civilians (1)**
52:22
**classes (1)**
11:14
**clear (4)**
22:18;30:18;31:8;
71:10
**clearly (1)**
18:13
**clerk (2)**
24:5,6
**client (1)**
31:2
**clock (1)**
27:19
**close (6)**
25:5;43:18;47:15;

53:24;65:17,18
**clue (3)**
25:20;60:23;69:1
**code (1)**
50:19
**colleague (1)**
5:3
**colleague's (1)**
48:13
**college (2)**
11:4,5
**colleges (1)**
11:23
**colon (1)**
66:7
**color (4)**
17:8;44:5;50:6,6
**combination (1)**
59:3
**coming (1)**
29:22
**command (1)**
10:5
**commit (2)**
22:15,16
**common (1)**
63:2
**communicate (1)**
5:10
**communication (1)**
38:23
**Community (1)**
11:5
**compiling (1)**
25:18
**complaint (4)**
7:14,15,19,20
**complaints (1)**
9:21
**complete (6)**
49:8,22,25;51:25;
52:5;55:14
**completed (4)**
8:7;20:25;30:20;53:2
**completes (1)**
54:10
**completing (1)**
51:23
**completion (2)**
21:21;55:1
**complexion (1)**
50:8
**complicated (1)**
14:13
**computer (1)**
27:8
**concealed (1)**
18:18
**concluded (1)**
71:15
**couclusion (1)**
37:24
**conducted (2)**

Case 2:17-cv-10531-NGE-SDD   ECF No. 32-5   filed 12/22/17   PageID.261   Page 23 of 30

Monique Bass v.
Bomber, Todd, Murphy, and City of Detroit

Eugene Bomber

Eugene Bomber – Vol. I
October 30, 2017

23:8;28:1
**confusion (1)**
29:7
**consistent (1)**
4:16
**contact (1)**
41:13
**contained (3)**
32:2;49:19;62:11
**conversation (1)**
7:7
**convicted (1)**
66:13
**copies (1)**
52:19
**copy (7)**
48:23;57:14;58:13;
60:24;63:23,23,25
**correction (1)**
28:3
**Corrections (2)**
56:7,8
**correctly (1)**
27:2
**corroborate (1)**
40:23
**counsel (1)**
4:15
**couple (3)**
13:21;15:7;48:15
**course (1)**
34:9
**Court (19)**
4:16;5:5;6:13;27:16;
32:10;34:10;59:24,24,
25;60:3;61:21,23,25;
62:4,9;67:2,3,14;69:7
**courts (1)**
67:24
**courtyard (1)**
56:3
**cover (2)**
14:4;48:20
**created (1)**
30:20
**credit (1)**
11:12
**credits (1)**
11:20
**crime (4)**
15:1;22:13,17;66:13
**crimes (6)**
13:25;14:25;15:2,2,
20;35:8
**Criminal (3)**
11:16,19,21
**CRISNET (1)**
68:14
**criteria (1)**
65:15
**cuffed (1)**
47:23
**curiosity (1)**

48:15
**currently (2)**
12:8,16
**custody (7)**
39:2,4,24;42:10;
45:25;56:8,13
**cut (1)**
17:10

**D**

**date (18)**
32:3;24;44:1;50:8;
53:9;59:14,15,18;60:6,
18;62:12;63:2;65:17;
67:1,11,16,22;70:18
**dates (2)**
43:5;51:17
**day (14)**
16:24;22:5,18;23:23;
24:25;25:14,23;29:11;
43:8;55:7;66:17;67:3,4,
5
**DDC (9)**
30:8;45:16;46:24;
47:2,7,8,12,25;52:9
**deal (4)**
22:21;24:20,21;29:21
**dealing (2)**
27:3;47:4
**Defendant (2)**
48:19;49:10
**definitely (1)**
34:22
**degree (2)**
11:11,13
**demeanor (1)**
10:3
**dep (1)**
16:14
**departed (1)**
26:21
**Department (8)**
8:20;15:11;23:3;
29:22;41:17;45:7;56:7,8
**depend (2)**
23:17;70:25
**depended (1)**
23:17
**depending (5)**
17:13;27:10;47:13;
52:3;56:4
**depends (5)**
19:8;27:22;52:6;56:4;
61:9
**deponent (1)**
6:9
**deposition (18)**
4:14,23,24;6:17;20:1;
33:9;48:13,20,22;49:3,
11;53:12;57:16;68:6,21;
69:25;70:7;71:15
**describe (1)**

47:6
**described (1)**
33:20
**desk (1)**
52:15
**details (1)**
41:8
**detainee (9)**
48:10;49:8,23;51:14;
52:7;53:5,13;54:9;55:14
**detective (5)**
13:4,6,8;14:1;63:16
**Detention (2)**
45:18;52:15
**Detroit (11)**
4:1;8:20;12:1,17;
15:11;19:15;31:17;
41:17,22;45:18;52:15
**difference (1)**
19:13
**different (12)**
21:11,14,20,20;29:23;
43:9;62:21,22;64:12;
68:9,11;70:22
**directly (3)**
47:7;51:19;53:15
**disciplined (1)**
10:12
**discovery (2)**
4:22;70:4
**discussed (2)**
6:18;7:4
**discussion (1)**
6:23
**discussions (1)**
7:9
**dispute (1)**
55:8
**District (3)**
32:10;34:10;59:25
**divided (1)**
25:22
**division (1)**
12:17
**divorcing (1)**
46:10
**divvy (2)**
25:1;26:1
**document (7)**
33:11;49:5,12;58:2;
59:5;61:24;70:9
**documents (2)**
8:3;70:11
**dogs (2)**
36:6,13
**done (10)**
6:11,13;7:7;23:24;
28:21;40:20,22;50:12;
61:6;68:11
**door (19)**
34:14,16,18;35:14;
36:11,17,18;37:6,23,
24,25;38:10,11;41:14;

45:25;48:3;56:5,6
**doors (2)**
48:3;55:21
**doubled (1)**
48:3
**DOW (2)**
59:17,18
**down (6)**
6:15;14:9,12;50:18;
62:3;64:14
**DPD (1)**
52:21
**drafted (2)**
8:4,6
**draw (1)**
37:24
**driver's (4)**
42:6;50:7;70:17,17
**driving (1)**
47:13
**duly (1)**
4:6
**During (7)**
15:15;30:3;40:2;
56:14,16;69:13;70:4
**duty (2)**
28:15,18
**dye (1)**
17:9

**E**

**earlier (1)**
33:20
**early (1)**
22:18
**easily (1)**
53:25
**education (1)**
10:17
**effecting (1)**
40:3
**eight (3)**
20:9;30:4,23
**either (8)**
41:2;42:3;48:8;51:19;
55:2;56:22;66:10;70:21
**Elicia (2)**
34:2;69:18
**E-L-I-C-I-A (1)**
69:18
**eligible (1)**
70:17
**else (8)**
7:25;25:19;29:19;
44:8;47:10;51:4;53:7;
65:21
**employed (3)**
12:16;15:11;69:3
**end (1)**
53:8
**ended (3)**
25:9;27:21;29:4

**enough (1)**
53:24
**ensuing (1)**
39:12
**entered (2)**
60:3,6
**entry (5)**
21:16;23:19;28:11;
31:4;32:24
**essentially (3)**
14:8;32:14;52:14
**established (1)**
41:6
**EUGENE (3)**
4:5,12,14
**evaluation (3)**
8:22,24;9:1
**evaluations (1)**
8:19
**even (7)**
8:11,15;35:7;43:24;
49:16,25;54:15
**event (2)**
22:6;36:11
**eventually (1)**
53:8
**Evidence (1)**
4:17
**exactly (3)**
11:7;36:20;38:14
**EXAMINATION (2)**
4:9;71:8
**example (1)**
32:3
**except (1)**
14:5
**excused (1)**
56:12
**execute (2)**
31:14,14
**executing (1)**
35:4
**Exhibit (53)**
20:1,4,4,14,19,24,25;
21:9,11,17;22:1;27:1,2,
20,24;28:17,20;29:8,9;
30:7,17,22;33:8,9,13,24;
45:22;46:25,25;48:19,
21;49:2,10,20;53:12;
57:15,16,16;61:20;63:25;
64:18;66:15,25;68:5,6,8,
13,20,21;69:17,25;70:2,
6,7
**exhibits (4)**
20:8;30:15;48:14;
53:11
**exist (1)**
70:21
**exit (2)**
47:15;55:19
**exonerated (1)**
10:8
**expect (1)**

Case 2:17-cv-10531-NGE-SDD   ECF No. 32-5   filed 12/22/17   PageID.262   Page 24 of 30

Monique Bass v.
Bomber, Todd, Murphy, and City of Detroit

Eugene Bomber

Eugene Bomber – Vol. I
October 30, 2017

16:6
experience (1)
  43:7
explain (5)
  21:16;44:24;64:24;
  65:5;70:6
exposed (2)
  18:21,22
externally (1)
  18:8
extra (2)
  12:9;68:10
extraordinary (1)
  40:24
extremely (1)
  66:21
eye (2)
  44:5;50:6

F

face (1)
  44:23
facial (2)
  17:17,17
fact (3)
  9:8;40:21;63:18
far (3)
  14:16;20:12;24:18;
  27:2;36:18;37:1;43:3;
  50:10;56:10;60:1;62:11
fatal (1)
  15:3
Federal (2)
  4:16,17
feels (1)
  16:21
felonies (2)
  22:15,16
felony (8)
  22:14;39:2,3,23;
  41:12;59:14;66:12;
  71:12
female (7)
  23:11;32:6;39:16,17,
  18;44:12;56:4
fenced (1)
  47:14
field (1)
  27:21
file (4)
  51:22,24;52:3;54:8
fill (8)
  48:8,16;49:18;50:3,4,
  5,21;51:8
filled (3)
  21:3;50:2,15
filling (2)
  51:9;53:21
fine (3)
  6:6;16:24;58:15
fingerprinting (2)
  55:25;69:14

Finkle (1)
  14:9
firefighter (1)
  12:12
first (34)
  4:6;5:4;16:25;21:16;
  22:1,5;23:12;24:9,15;
  26:3,12;34:23;35:19;
  38:7,19,23;41:14,21;
  42:12,13,24;48:16;50:6;
  51:22,25;52:4,8,20;
  55:20;58:15;64:10,25;
  65:12;66:5
Five-10 (2)
  17:6;35:25
Floyd (1)
  62:8
focus (8)
  13:25;14:3,16,18,24,
  24;22:14;44:6
focusing (1)
  15:8
folder (17)
  48:9,17,20,24,25,25;
  49:3,19;51:8,14,22;52:3,
  19;53:15,21;54:9;55:14
follows (1)
  4:8
foot (1)
  43:22
force (4)
  40:2,10,15,16
forever (1)
  16:21
forgery (1)
  59:14
form (7)
  7:14,15,19;57:22;
  68:11,12,15
former (1)
  6:22
forth (1)
  27:2
fortunate (1)
  27:10
fortunately (1)
  27:8
four (4)
  15:17,24,25;22:6
front (4)
  36:11;39:20;45:13;
  62:13
fugitive (6)
  51:3;53:3;54:10,14,
  14;71:12
full (4)
  4:11;6:14,14;17:19
fully (3)
  19:12;33:22;56:12
funds (2)
  30:2,2
further (2)
  53:23;71:6

G

game (1)
  7:5
Gate (1)
  47:14
gated (1)
  47:14
gave (1)
  63:2
Gender (3)
  43:14;44:5;56:6
general (4)
  14:14;43:18,24;48:5
generally (19)
  14:22,23;17:24;37:19;
  38:16;39:4,13,17,20;
  41:11;43:21;51:24;52:4;
  53:20;55:15;57:22;58:1;
  61:22;70:14
gets (4)
  25:1,14;51:3;54:24
gist (2)
  14:8;23:17
given (7)
  22:10;46:18;53:6,15;
  54:2,8,14
gives (1)
  14:14
glass (1)
  52:17
glasses (3)
  17:22,22,23
gleaned (1)
  70:14
goes (3)
  8:25;14:5;46:25
Good (10)
  4:18,19;6:10,14;
  16:14;19:24;26:15;
  36:13;44:8,23
gotcha (1)
  29:5,7
grab (1)
  25:2
graduate (1)
  11:2
Grand (2)
  14:10,12
great (7)
  5:24;8:13;16:13,14;
  61:3,4,5
green (2)
  18:7;33:16
Greg (1)
  21:8
grounds (1)
  5:2
guarantee (1)
  36:23
guess (2)
  33:4;61:23

gun (2)
  18:8,18
guys (2)
  46:13;50:15

H

hair (5)
  17:8,17,18;50:6;66:25
half (5)
  49:23,24,25;62:16;
  66:15
halfway (1)
  50:18
hand (2)
  52:13;56:6
handcuff (3)
  39:7,13,20
handcuffed (2)
  39:4,5
handcuffs (1)
  39:18
handle (1)
  35:5
hands (1)
  45:11
handwriting (2)
  49:5,12
handwritten (1)
  27:9
hanging (1)
  18:17
happen (7)
  15:20;24:23;27:16;
  40:8;44:11;54:19,23
happened (4)
  27:17;36:12;54:1,11,17
happens (6)
  14:1;44:15;47:12;
  54:3,6;62:23
head (2)
  5:11;12:10
hear (3)
  8:14;56:23,25
hearing (1)
  69:7
heavy (1)
  43:11
height (7)
  17:5;43:16,17,21;
  50:8;51:15;62:12
held (1)
  12:23
help (5)
  5:7,8;19:19,21;22:17
helps (1)
  6:15
here's (2)
  44:6;59:9
hi (1)
  41:15
high (2)
  10:18;47:14

highest (1)
  15:20
historic (1)
  16:16
hold (5)
  51:3;54:10,14,15,16
holding (1)
  48:5
holds (1)
  53:3
home (1)
  15:3
homeless (1)
  17:14
homicide (2)
  12:17;15:2
honest (1)
  24:2
honestly (6)
  10:4;16:21;34:8;43:6;
  56:20;68:3
hopefully (1)
  25:5
hour (1)
  35:22
hours (14)
  11:12;15:21;20:9,20;
  21:23,23;28:24;29:10;
  30:4,22,23;35:22;60:9,
  12
house (10)
  34:22,24;35:13,19;
  36:4;41:13;45:3;46:13,
  18;47:20
hundred (1)
  14:7
Hundreds (1)
  37:17

I

ID (7)
  42:6,12;43:4,4;50:1;
  51:19;62:14
idea (7)
  22:14;26:10;31:21;
  35:20;36:13;46:23;54:5
identification (9)
  20:2;33:10;41:3;42:3;
  57:17;68:7,22;70:1,8
identify (1)
  41:21
ie (1)
  15:2
in-car (1)
  8:16
incident (14)
  4:21;8:3,9;15:8;16:24;
  39:24,25;40:7,10,25;
  41:7;45:23;66:18;68:9
indeed (1)
  70:16
indicate (2)

Case 2:17-cv-10531-NGE-SDD   ECF No. 32-5   filed 12/22/17   PageID.263   Page 25 of 30

Monique Bass v.
Bomber, Todd, Murphy, and City of Detroit

Eugene Bomber

Eugene Bomber - Vol. I
October 30, 2017

28:17;55:9
**individual (1)**
    70:25
**infinite (1)**
    65:20
**information (41)**
    31:22;32:2;34:5,6,7;
    43:25;44:7,9;46:1;48:9;
    49:2,19;50:4,7;51:7,8,
    10,12;52:18;53:9;54:9,
    14;55:2;56:9;57:12,19;
    58:11,14;60:1,14,18;
    62:11;64:14;66:15,22,
    24;67:6,9,21,25;70:14
**informed (5)**
    38:3;39:1,3,22,23
**initial (2)**
    56:1;66:21
**initially (1)**
    55:24
**input (7)**
    49:8,23;51:14;52:7;
    53:5;54:9;55:14
**inputting (1)**
    44:10
**inquiry (1)**
    63:13
**inspection (2)**
    23:20,23
**instance (1)**
    63:1
**instead (3)**
    30:2;44:12,12
**intake (3)**
    48:10;53:13;56:10
**interaction (2)**
    31:1;38:20
**Internal (1)**
    10:9
**interrogation (1)**
    69:4
**Interrogatories (1)**
    7:23
**Interrogatory (1)**
    7:22
**interrupted (1)**
    14:22
**into (17)**
    26:16;36:15;39:2,4,
    24;42:10;45:25;46:25;
    47:13;48:5;55:20,23;
    56:5,5,6;60:3,6
**introduction (1)**
    23:20
**invasions (1)**
    15:3
**investigation (1)**
    10:10
**involve (1)**
    10:3
**involves (1)**
    14:1
**involving (2)**

15:9;26:24
**issue (2)**
    22:22;71:2
**issued (4)**
    32:17,21;34:11;59:15
**issues (2)**
    50:15;56:12
**items (1)**
    52:12

**J**

**January (1)**
    60:6
**JJ (1)**
    58:24
**job (3)**
    5:8;6:15;12:20
**jogs (2)**
    14:12;68:24
**Johanna (3)**
    6:22;16:4;26:13
**Johnson (5)**
    58:22,23;63:16;64:2,4
**Joseph (3)**
    24:10,17,18
**Judge (3)**
    44:23;45:6,13
**judging (1)**
    56:5
**June (2)**
    62:1,7
**justice (3)**
    11:16,19,21

**K**

**keep (1)**
    14:5
**kind (9)**
    11:14;14:16;15:8;
    23:15;35:4;36:18;50:14;
    53:22;69:12
**Kiosis (1)**
    55:23
**knee (2)**
    62:18,19
**knock (3)**
    34:24;35:14;36:11
**knocked (4)**
    34:14;37:6,23,25
**knocking (1)**
    37:2
**knocks (1)**
    38:17
**knowing (1)**
    37:21
**known (3)**
    22:16;24:24;34:6
**Knox (1)**
    68:16

**L**

**label (5)**
    33:7;57:14;68:4,19;
    70:6
**labeled (2)**
    20:3;68:8
**land (1)**
    36:10
**large (1)**
    53:22
**last (12)**
    6:9;8:22;10:1,13;32:1,
    21;42:12,13;45:22;
    48:13;50:5,19
**later (1)**
    5:16
**layout (2)**
    36:10,13
**least (4)**
    35:9;38:19;41:7;49:24
**leave (1)**
    6:7
**led (1)**
    48:4
**left (1)**
    5:5
**LEIN (23)**
    7:17;26:14,15,19;
    32:15,24;34:5;41:3;
    43:6;44:7,21;51:7,9;
    52:16;54:16;55:3;57:19;
    58:16;60:3,6;61:11;
    62:4;64:2
**L-E-I-N (1)**
    58:16
**license (2)**
    42:6;50:7;70:17,18
**lie (1)**
    62:24
**Lieutenant (4)**
    23:8,14,20,24
**light (3)**
    17:17,17;19:13
**likewise (1)**
    6:11
**line (2)**
    58:15,16
**lines (1)**
    56:18
**links (2)**
    65:16,20
**listed (3)**
    36:25;37:22;67:9
**literally (2)**
    27:18;61:17
**little (4)**
    5:7;32:25;33:25;61:20
**live-scan (1)**
    50:2
**locate (1)**
    35:24

**located (2)**
    32:14;56:3
**location (1)**
    33:1
**locks (1)**
    48:4
**Lodge (1)**
    14:8
**log (15)**
    8:4;19:22;20:19;21:7,
    14,16,19,23;27:2;30:20;
    32:3;45:20;46:4,6;56:23
**long (5)**
    12:23;13:10,19,20;
    16:12
**longer (1)**
    29:16
**Longfellow (3)**
    31:16;34:14;69:19
**look (17)**
    8:5;20:24;32:25;
    42:11,12;43:1,3,4,5,11;
    45:20;46:18;59:10,13;
    61:20,24;69:19
**looked (1)**
    17:14
**looking (6)**
    26:18;27:1;30:6;
    43:22;66:15;69:17
**looks (16)**
    20:6,8,11;21:13;22:5;
    23:7;28:10;29:4;31:1;
    35:7;45:22;46:24;48:23;
    49:22;67:19;70:12
**lot (4)**
    5:10;12:9;43:17;50:1
**lying (1)**
    14:7

**M**

**ma'am (1)**
    45:5
**machine (1)**
    55:23
**Macomb (1)**
    11:5
**maiden (2)**
    42:20;59:11
**major (2)**
    11:18;15:2
**makes (3)**
    21:25;44:9,10
**making (2)**
    48:7;55:3
**male (5)**
    17:2;23:11;39:17;
    44:12;56:4
**mandatory (2)**
    23:1,2
**manner (1)**
    18:19
**many (2)**

9:10,24
**marital (1)**
    50:9
**marked (10)**
    19:12;20:1;33:9,22;
    48:13;57:16;68:6,21;
    69:25;70:7
**markings (1)**
    19:7
**married (2)**
    42:19,21
**match (1)**
    57:9
**matches (3)**
    42:2,14;64:21
**matter (4)**
    6:18;35:3;39:18,19
**May (22)**
    4:22;6:5;8:11;12:24;
    13:14,16;14:9,15;15:12,
    12;17:24;20:7;28:12;
    43:20;45:8;49:13;52:1;
    1;58:6;59:6;61:2;70:23
**maybe (2)**
    35:25;70:23
**M-COLES (1)**
    12:5
**MDOC (1)**
    28:10
**mean (27)**
    12:11;16:5,5;24:22;
    26:8;32:21;35:13,16;
    38:5;39:25;40:4,7;
    43:21;44:21;47:2;58:16,
    18;59:21;61:8,21;62:3,
    19,22;66:9;67:2;70:11,
    21
**means (7)**
    4:23;39:4;40:10;
    60:14;61:17;62:5;66:10
**meat (1)**
    41:18
**medical (3)**
    50:15;56:11,12
**memory (2)**
    19:21;68:24
**mental (1)**
    50:15
**mentioned (1)**
    48:15
**Michigan (6)**
    4:1;41:2;42:3;51:19;
    56:7,7
**middle (6)**
    42:12,13,24;50:6;
    70:20,21
**might (4)**
    17:19;39:9,9;58:6
**military (1)**
    10:15
**mind (1)**
    29:7
**minimum (1)**

Monique Bass v.
Bomber, Todd, Murphy, and City of Detroit

Eugene Bomber

Eugene Bomber – Vol. 1
October 30, 2017

38:10
minutes (3)
28:21,25;35:25
misdemeanor (1)
64:15
Mm-hm (24)
13:24;15:10;20:10;
21:18;24:12;29:3;31:7;
34:1,4;35:10;37:14;
38:4;43:2,10,21;45:21,
24;59:12;60:5,8,10,13;
62:17;66:8
modified (6)
18:3;19:2,3;60:11;
67:20,22
modify (1)
18:5
moment (2)
27:5;34:20
Monday (1)
4:2
money (1)
55:24
Monique (19)
4:21;31:9,12,22;34:2,
3;59:10,11,11;63:6;64:4,
7,11,21,24;65:1,4;69:18;
71:11
months (1)
14:20
more (8)
12:11;13:21;16:18;
23:1;29:18;43:7;44:14;
47:17
morning (1)
29:5
most (2)
11:20;15:20
mother-in-law (1)
10:20
Mott (1)
10:19
Mrs (1)
37:23
much (7)
7:6;24:24;26:2;37:3;
58:4;66:24;67:17
mugshot (1)
68:23
Murphy (5)
49:19;51:4;53:2,16;
54:3
Murphy's (4)
48:19,22;49:2,11
myself (3)
41:21;48:8;59:3

N

name (56)
4:11,20;6:21;10:21;
16:3,4;22:10;23:12;
24:9,15;32:1;38:21;

41:16,24;42:1,13,13,20,
20,21,24;43:1;50:5,6,6;
53:9,10;59:11;60:18;
62:23,25;63:1,2,3,16,17;
64:15,22,25;65:1,2,4,4,
16,19;66:6,11,11,12,16,
25;67:11;69:18;70:18,
20,21
named (2)
44:17;64:10,11
names (5)
21:14;27:12;50:4;
62:24;70:19
name's (1)
44:19
Nathaniel (6)
31:5,11,22;35:8;46:1,
7
naturally (1)
5:10
nature (1)
67:15
necessarily (1)
63:5
necks (1)
18:13
need (2)
6:4;42:10
neighborhood (1)
17:6
new (2)
19:10;26:9
next (7)
5:7;42:2;43:8;55:15,
16;59:20;62:18
nobody (1)
40:11
nod (1)
5:11
non (1)
15:2
nonetheless (1)
69:13
non-violent (3)
35:8,17;41:12
normal (6)
20:19;26:22;27:18;
28:9;30:4,23
normally (4)
16:6;56:22;57:4;58:3
Nos (1)
20:1
Notary (1)
4:6
note (3)
47:10;57:1,4
notice (1)
4:15
November (1)
59:16
number (15)
22:16;32:12,13,14,16;
50:1,1,1,2,7,20;59:22;

60:4;65:14,15
numbers (2)
32:21;65:17

O

oath (1)
4:8
obviously (6)
9:16;35:16;41:19;
46:6;59:10;67:2
OCA (6)
32:12,13,16;59:20;
67:1,15
occasion (2)
26:22;54:8
occurred (1)
4:22
occurring (1)
36:1
o'clock (5)
28:16,19;29:1,1,4
October (1)
4:2
off (16)
7:5;10:24,25;11:7;
12:10;28:15;30:12,13;
36:11;43:18;56:7;63:19,
20;65:6,25;66:3
off-duty (1)
28:11
offenders (2)
22:17;24:25
offense (3)
5:18;59:14;67:1
officer (9)
13:4;24:5,6;37:9;
39:13,17;41:22;48:8;
50:19
officers (3)
25:22;29:25;52:22
official (1)
68:10
often (3)
8:14;44:11,14
Old (1)
26:8
Once (11)
9:11;51:3;52:9;55:17,
17,19,24;56:1,5;61:8,15
on-duty (1)
28:1
one (47)
4:20;5:4,25;13:11;
14:24;15:1,6;16:14;
18:24;20:8,11,14;21:14;
26:1,12,14,18;27:15,15;
30:6;31:11,11;35:2,5,7;
36:17,18;37:2,22,25;
39:13;41:21;43:8;47:3,
5,16;48:3,16;52:4,5,7;
54:24;55:12;58:13;65:7,
19;66:1

one-page (1)
58:2
ones (3)
16:14;61:4,5
only (6)
18:20;19:13;29:18,20;
37:2;44:8
onto (1)
55:15
open (1)
18:12
opened (1)
38:11
operate (1)
64:1
operation (1)
30:9
operations (5)
13:17;14:15;15:25;
18:4;19:5
operator (2)
58:22;62:8
operator's (1)
66:6
opportunity (2)
6:14;9:2
opposed (2)
19:14;42:21
ops (9)
13:17;14:23;17:25;
18:5,6;19:2;27:22;
29:12;33:15
order (13)
22:7,9,10,22,24;24:4,
19;25:13;29:16,18,21,
23;30:3
ORI (1)
60:4
originated (1)
25:9
O'Rourke (1)
28:1
O-R-O-U-R-K-E (1)
28:3
Otherwise (1)
6:2
out (27)
18:12,17;21:3;24:20,
21;25:5,8;27:19,20;
29:22;30:1;32:9;34:9;
35:25;36:3,12,18;45:11;
48:8,16;49:19;51:8,9;
53:21;58:19,25;59:24
outside (1)
25:7
over (10)
5:2,3;10:17;11:11;
23:15,22,22;27:7;55:22;
58:12
overtime (14)
20:8,9,14,16,17;22:19;
23:1;26:16;27:17;28:8;
29:22,25;30:1,22

one-page (1)
58:2

P

packet (4)
32:5,7;34:2;44:16
packets (6)
24:20,21;54:24;55:1;
57:23;58:3
page (1)
45:22
pages (1)
30:16
paid (1)
30:1
pants (2)
18:7;33:16
paper (3)
40:21;61:10;62:7
paperwork (2)
52:19;54:3
paramedic (1)
12:12
part (5)
14:24;15:1;22:6;53:5;
64:18
partially (1)
33:4
particular (5)
13:25;15:19;19:16;
36:20;41:7
partner (23)
6:20,22;16:1,5,6;
26:13,17;33:1;34:18;
37:1;38:17,20,23;39:10,
23;44:25;47:18;49:18.
22;50:12,23;55:1,2
partners (1)
16:21
partner's (1)
6:21
past (1)
41:2
patrol (1)
12:21
pay (1)
56:24
payroll (2)
29:19,21
PBC (1)
40:11
PD (1)
8:20
PDU (3)
13:6,23;58:24
pension (1)
50:20
people (9)
22:11,15;24:4;43:8;
52:13,16;62:24;64:8;
69:2
people's (2)
27:12;66:22
percent (1)

Monique Bass v.
Bomber, Todd, Murphy, and City of Detroit

Eugene Bomber

Eugene Bomber – Vol. I
October 30, 2017

14:7
**performance (2)**
8:19,22
**permission (1)**
46:19
**person (28)**
38:7,21;40:6,21,21;
42:9;43:22;44:8,16,17;
54:9,15,16,25;56:17;
57:10;60:20;62:13;
64:25;65:21;68:1,2,25;
69:18,19;70:18,22,24
**person's (1)**
65:16,19;66:16
**photo (2)**
43:3;58:8
**photograph (2)**
42:5;68:24
**physical (2)**
36:3;61:10
**physically (4)**
28:6;53:6;57:9;66:17
**pick (7)**
30:10;44:25;45:1;
60:1,2;67:2,14
**picture (2)**
41:3;57:6
**piece (1)**
61:10
**pile (6)**
25:14,21;26:1,3;
61:16,17
**place (3)**
18:24;19:24;56:1
**placed (3)**
39:2,3,24
**plainclothes (6)**
17:25;18:3,14,16,23;
33:3
**plate (1)**
25:12
**platoon (4)**
15:17,24,25;22:6
**plead (1)**
45:14
**please (6)**
4:11,13;5:14;6:10;
34:20;38:22
**pm (18)**
4:3;10:25;11:1;15:18;
20:2;30:13,14;33:10;
57:17;63:20,24;66:3,4;
68:7,22;70:1,8;71:15
**point (11)**
16:19;17:14,19;23:15;
44:18;45:10,10;48:7;
53:20;56:1,2
**Police (15)**
8:20;12:1,17;13:3;
15:11;18:21;19:15;23:3;
33:14;34:13;37:13;
39:25;41:17,22;45:15
**policy (1)**

45:7
**Polo (2)**
18:7;33:19
**pop (1)**
63:3
**porch (4)**
36:24;38:13,15,16
**port (1)**
47:14
**portion (1)**
55:19
**position (7)**
12:23;13:2,10,15,19;
14:16;24:18
**possibility (1)**
65:23
**possible (3)**
54:19,20;66:22
**pounds (3)**
17:7;43:19,23
**power (3)**
15:17,19,23
**PPCT (1)**
40:12
**pre (2)**
22:19;28:9
**precinct (16)**
12:22;13:3,4,6,6,9,17;
14:2,4,25;22:17;25:6,8;
30:2;31:19;68:17
**preliminarily (1)**
47:21
**preparation (1)**
7:12
**presence (1)**
7:7
**present (3)**
56:14;57:12;69:13
**pretty (8)**
6:9;12:18;24:24;26:2;
27:23;37:3;58:4;67:16
**previous (1)**
70:19
**previously (2)**
66:12;67:19
**primarily (1)**
23:18
**primary (1)**
14:3,24
**print (1)**
58:25
**printed (3)**
27:9;57:10;58:19
**printout (5)**
7:17;58:7,10;61:7,11
**printouts (1)**
43:6
**Prior (7)**
6:17;13:2,3;20:17;
28:25;30:23;55:3
**prisoner (6)**
47:15;52:20;56:2,6,9,
13

**Prisoners (1)**
52:20
**prisoner's (1)**
48:9
**probably (5)**
17:1,6;18:18;37:24;
69:16
**probation (1)**
31:6
**problem (1)**
6:6
**procedure (1)**
26:22
**process (4)**
46:9;47:6;56:16;69:14
**processed (3)**
53:23;55:17,24
**processing (1)**
55:18
**produced (1)**
70:4
**professional (1)**
12:7
**promoted (1)**
8:23
**prosecutor (1)**
44:22
**protocol (1)**
39:17
**provide (1)**
53:9
**provided (1)**
57:19
**Public (1)**
4:6
**publishing (2)**
32:9;35:3
**pull (1)**
47:13
**purpose (2)**
36:9;58:9
**purposes (1)**
4:16
**pursuant (2)**
4:14;9:1
**put (8)**
43:18;51:23;55:23;
56:22;64:4,7,22,24
**putting (1)**
44:9

**Q**

**quarter (1)**
50:14
**question's (1)**
6:11
**Quinn (3)**
58:22,23;64:4
**quote (2)**
28:22,22

**R**

**race (4)**
43:12;44:5;50:8;66:25
**ran (2)**
63:16;66:11
**rank (1)**
8:23
**rational (1)**
46:5
**R-E (1)**
63:12
**read (6)**
5:16;27:7;37:13,21;
39:25;40:17
**reading (1)**
34:20
**re-adjusting (1)**
14:5
**really (8)**
9:18;21:1;23:17,17;
26:8;48:14;56:24;66:19
**reason (5)**
15:19;22:22;25:1;
26:21;29:20
**reasons (1)**
65:15
**recall (20)**
10:14;23:21,25;28:7;
30:20;31:24;34:23;37:7;
39:8;40:17,20;41:8;
46:3;51:21;54:12,18;
55:11;56:16,19,20
**receive (1)**
67:25
**recent (2)**
12:18;26:4
**recently (1)**
8:23
**recognize (1)**
49:5,11;51:1
**record (23)**
4:11,13;6:21;10:24,
25;11:1;17:2;30:12,13,
14,18;33:13;49:10;50:5;
63:19,20,21;65:1,7,25;
66:3,4;71:10
**redacted (7)**
27:12,13;63:22,23,23,
25;64:16
**redactions (3)**
57:20;62:18;64:10
**reduce (1)**
22:17
**reducing (2)**
14:24;22:16
**refer (1)**
33:5
**reference (1)**
59:22
**referenced (1)**
58:17

**referred (1)**
53:22
**referring (1)**
34:13
**reflect (2)**
4:13;33:13
**regarding (3)**
4:21;9:14;63:13
**REHMAN-BARTON (8)**
7:22;65:6,9,11,13,25;
71:9,13
**reiterate (1)**
15:24
**related (1)**
24:4;31:23;64:15;65:4
**relatively (1)**
17:10
**rely (2)**
43:24;44:3
**remarks (3)**
60:2;61:21;67:3
**remember (16)**
17:16,21;18:6;19:9,
16;23:13;34:8;37:4,6;
40:22;51:1,20;66:19;
68:3;69:9,11
**remotely (1)**
62:25
**repeat (2)**
30:19;38:22
**rephrase (2)**
5:23;6:1
**report (18)**
33:5,7,14,14;34:13,15;
37:8,22;38:8;39:1;40:1,
17;45:15;56:23;68:9,10,
14,23
**reporter (3)**
5:6;6:13;27:16
**reports (1)**
37:13
**representing (1)**
4:21
**reprimanded (1)**
10:12
**requested (1)**
22:25
**re-run (3)**
26:14,19;51:6
**resembling (1)**
62:25
**residence (1)**
47:8
**respect (1)**
8:3
**response (3)**
5:13;6:15;46:9
**responses (2)**
5:9;7:22
**responsible (1)**
25:18
**restore (14)**
22:7;9,10,21,23;24:4,

| Monique Bass v. | Eugene Bomber | Eugene Bomber – Vol. I |
|---|---|---|
| Bomber, Todd, Murphy, and City of Detroit | | October 30, 2017 |

19;25:13;29:16,18,21,
25;30:3,9
**restroom (1)**
6:5
**re-verify (1)**
55:2
**review (1)**
10:6
**reviewed (4)**
7:12;8:1;21:13,14
**rhythm (1)**
25:1
**Richard (1)**
68:16
**rid (1)**
27:15
**right (34)**
5:2,5,6;17;7:12,25;
8:17;12:5,16;13:12;
17:2;19:9;24:3;26:16;
27:1;29:14;37:13;38:11;
39:5;40:12;49:18;51:24;
53:14;54:6;61:1,12,20;
62:19,20;63:10;65:13;
67:12,14;71:5,14
**robberies (1)**
15:3
**Rodak (2)**
21:20;22:2
**R-O-D-A-K (1)**
22:3
**role (9)**
23:8,16,19;25:25;
27:19;28:1,6,21;30:7
**room (1)**
53:22
**R-O-O-U-R-K-E (1)**
28:2
**routinely (1)**
16:1
**Rules (3)**
4:16,17;5:2
**run (3)**
51:6;53:10;62:23
**running (2)**
36:12;52:16
**runs (1)**
63:17

---

**S**

**safely (1)**
38:20
**safest (1)**
36:14
**sally (1)**
47:14
**same (8)**
5:2;6:10;16:14;18:14;
32:1;58:14;59:6;69:24
**saw (2)**
35:25;60:25
**saying (1)**

**67:4**
**scan (1)**
56:2
**scanned (1)**
56:1
**scar (1)**
62:19
**scars (1)**
50:9
**scenario (1)**
36:21
**scheduled (1)**
15:18
**school (1)**
10:18
**scout (2)**
19:12;33:22
**SCR (1)**
62:18
**search (1)**
64:4
**searched (4)**
47:16,20,25;52:21
**second (7)**
23:19;30:12;49:7;
50:14;58:15;65:7;66:1
**Secretary (5)**
42:5;58:7,8,9;70:12
**section (2)**
53:2;54:10
**security (2)**
50:7;65:17
**seeing (1)**
21:15
**seemingly (1)**
42:1
**seldom (1)**
8:16
**self-sufficient (1)**
27:23
**sense (6)**
5:22;14:14;21:25;
29:24;44:10;63:18
**separate (1)**
31:9
**separated (1)**
52:17
**separation (1)**
52:14
**Sergeant (5)**
4:12;8:24;21:8;28:1;
68:16
**series (1)**
56:10
**set (5)**
27:2;48:3;55:21;
64:10;70:25
**seven (4)**
10:1,13,14;20:23
**sex (2)**
50:8;51:17
**Sexton (1)**
10:22

**shall (2)**
45:8,8
**share (1)**
25:14
**Shawn (1)**
4:20
**sheet (11)**
48:10;49:8,23;51:14;
52:7;53:5,13,21;54:2,9;
55:15
**shift (26)**
15:14,17,18,19,23;
16:7;20:12,17,19;21:22;
22:19;23:7,15,23;25:23;
27:17,18,21,23;28:9,22,
24;29:2,8,9;30:23
**shirt (4)**
18:7,11;33:18,19
**shootings (1)**
15:3
**short (1)**
17:10
**shoulders (1)**
5:11
**show (7)**
19:21;20:3;48:19;
57:18;68:4,8,19
**shows (1)**
25:13
**shred (2)**
61:17,19
**shrug (1)**
5:11
**sic (2)**
34:15;40:12
**SID (1)**
50:1
**side (1)**
19:15
**sign (1)**
21:21
**signature (3)**
21:4;50:25;51:1
**signed (4)**
44:22,23;45:6,11
**Similar (2)**
59:7;67:19
**simple (1)**
35:15
**simply (1)**
23:16
**sister (1)**
16:23
**sit (1)**
35:24
**sitting (2)**
7:1;53:22
**situation (7)**
19:2;28:9;36:16,19;
41:11,12;44:15
**six (1)**
43:22
**slash (1)**

**10:8**
**smoke (1)**
6:5
**SMT (1)**
62:18
**social (2)**
50:7;65:16
**somebody (26)**
34:14;36:11;39:5,6,
14,22;41:13;42:19;44:9;
46:6;48:7;51:4;53:7;
54:13,24;58:19,20,25;
62:21,22;64:10,11;
65:18;66:10,10;70:20
**somebody's (1)**
62:23
**somehow (1)**
65:20
**sometimes (3)**
25:8;43:17,19
**somewhere (4)**
17:6;25:19;30:9;47:10
**sorry (9)**
12:15;13:5,18;14:22;
24:15;28:5;34:20;48:12;
65:11
**sort (2)**
15:4;67:13
**sounds (1)**
11:20
**source (1)**
68:1
**space (1)**
58:16
**speaking (1)**
48:21
**Special (15)**
13:17,17;14:14,23;
15:25;17:25;18:4,5,6;
19:2,5;22:6;27:22;
29:12;33:15
**specific (1)**
41:8
**specifically (4)**
13:20;19:17;22:21,23
**spot (1)**
30:1
**stack (3)**
24:24,24;26:17
**stage (1)**
52:21
**stamp (1)**
48:23
**stamped (1)**
49:3
**stapled (1)**
30:16
**start (6)**
13:23;19:24;23:23;
28:22,24;29:9
**started (2)**
13:12;29:8
**state (11)**

**4:11;42:5,6,12;43:4;**
50:9;51:19;58:7,8,9;
70:12
**stated (1)**
67:19
**statement (2)**
43:19,24
**statements (2)**
56:18,21
**statewide (1)**
60:2
**station (1)**
27:19
**status (1)**
50:9
**stay (3)**
27:20;36:18;55:18
**steps (1)**
41:6
**still (5)**
13:14;19:3;26:15,19;
30:3
**stop (1)**
48:11
**straight (3)**
18:16;20:11,15
**struck (1)**
48:15
**struggle (1)**
39:12
**Stuff (5)**
12:14;40:12;50:20;
53:10;63:18
**style (1)**
18:7
**subject (3)**
10:9;68:1;70:24
**sued (1)**
8:17
**supervisor (10)**
12:21;15:5,6;21:6,13,
19;22:1;50:25;52:15,15
**supervisors (1)**
21:21
**suppose (1)**
12:4
**sure (18)**
5:9;10:9;12:9;17:17;
18:23;19:16;20:8;26:14,
19;27:6;32:22;33:6;
34:21;42:13;45:2;48:7;
49:14;66:2
**surveillance (1)**
35:21
**sustained (2)**
10:7,8
**switched (1)**
11:18
**sworn (1)**
4:6
**system (3)**
45:6;58:17;61:8

Monique Bass v.
Bomber, Todd, Murphy, and City of Detroit

Eugene Bomber

Eugene Bomber – Vol. I
October 30, 2017

## T

tag (1)
29:18
talk (1)
45:22
talking (2)
57:24;61:9
talks (2)
50:14,18
tall (1)
43:22
TALON (4)
51:7;52:16;53:10;55:3
target (2)
66:10,11
Targeted (1)
22:14
tattoos (1)
50:10
taught (1)
10:20
TCM (1)
50:1
technically (1)
28:24
techniques (2)
40:12,13
tells (2)
40:2;60:20
term (1)
64:4
terminated (1)
10:12
testified (1)
4:8
testimony (1)
5:20
testing (1)
8:25
though (2)
11:12;66:6
thousands (1)
37:17
three (4)
20:23;50:20;61:4,5
Throughout (4)
8:21;14:20,20,20
timeframe (2)
30:17;55:4
times (5)
5:10;9:10;15:7;43:17,
18
today (11)
4:24;6:17,24;7:10,13;
12:17,19;17:17,22;
57:19;58:19
Todd (11)
6:22;16:4,12;26:13,
18;37:9,21;38:5,21;
48:8;59:3
together (3)

34:19;36:17,24
Tomassini (1)
21:8
top (9)
12:10;19:14,14;21:4;
29:14;49:24,25;63:10;
66:6
totally (1)
64:11
toward (1)
11:20
towards (1)
12:11
tracking (1)
32:14
traditionally (1)
27:23
training (2)
9:14;12:9
transcripts (1)
5:16
travel (1)
18:24
trespassing (1)
64:15
tricky (1)
46:20
true (1)
27:11
truly (1)
26:8
truth (3)
4:7,7,8
trying (1)
10:14
turn (1)
37:11
turned (1)
21:23
two (8)
6:23;16:14;21:13,14;
32:21;35:22;52:8;53:3
two-page (1)
58:1
type (13)
9:2;22:12;23:8;35:3,
21;36:16,19;39:12;
40:11;56:18;61:9;66:13;
69:7
types (3)
22:13;35:17;40:8
typical (1)
16:5
typically (15)
22:15;26:17;27:16;
28:8;35:1,13,19;39:16;
42:15,18,24,25;43:11;
49:3;61:14
typing (1)
5:6
typo (2)
44:9,12

## U

UC (1)
19:1
uh-huhs (1)
5:17
uh-uh (1)
5:15
uh-uhs (1)
5:17
un (2)
63:22,22
under (4)
18:11;46:20,22;66:5
undercover (1)
19:3
underneath (2)
19:13;60:4
understandable (1)
5:24
understood (1)
6:3
Unfortunately (4)
44:14,24;45:9;62:24
uniform (5)
18:4,4,5,6;33:15
unit (7)
13:4,6,8,17,17;14:15,
23
Unless (1)
18:20
unmarked (1)
18:25
up (25)
10:5;25:1,9,13,22;
26:1;30:10;34:18,22,24;
35:13;36:23;37:1,25;
47:13;50:4;53:8;60:1,2;
62:25;63:3,18;64:8;
67:2,14
upon (2)
4:8;35:4
upper (2)
62:16;66:15
use (1)
40:11
used (8)
4:15;40:2,11,15,16;
41:5;65:18;70:19
using (1)
38:7
uttering (2)
32:9;35:2

## V

vacations (1)
16:7
valid (2)
43:25;70:16
value (1)
44:23

varied (2)
26:6,8
varies (1)
17:16
vehicle (5)
18:25;19:15;23:20,22;
47:16
verbal (4)
5:9,13;9:12;38:19
verbally (2)
51:10,12
verification (3)
41:3;55:4,5
verified (2)
26:11;42:9
verify (5)
40:20;42:3;54:25;
58:14;62:12
verifying (2)
9:15;21:22
versus (2)
5:15;27:9
via (3)
30:2;41:3;42:3
video (4)
8:9,11,16;23:20
violation (1)
31:6
violent (2)
15:2;66:13
visible (1)
18:13
visor (1)
19:14
volume (1)
15:20
volunteer (1)
23:5

## W

wait (1)
6:10
waiting (1)
53:23
walk (3)
35:19;36:3;56:2
warrant (8)
7:14,15;9:14;25:9,16;
28:10;31:9,11,12,21;
32:5,6,14,17;34:2,5,9;
35:3,4,9;39:2,3,23;
40:21;41:12;42:2,9,14,
23;43:4;44:10,16,17,21,
21;45:3,8;53:3,5;55:9;
56:17;57:6,10,11,12,14,
23;58:3;59:15,15,18;
60:11,25;61:6,9;66:14,
17;67:2,7,16,21;68:2;
70:20,24;71:12
warrants (19)
9:15;22:11,12,12,14;
24:4,19;25:22;26:4,8,8,

10,12,17;31:15;35:2,18;
44:6;51:4
warrant's (3)
26:15;45:5,10
Warren (2)
10:19;14:12
way (8)
5:6;8:15;21:1;43:6,18;
55:12;57:9;69:17
weapon (1)
40:11
wear (2)
17:22,23
weather (1)
43:7
week (1)
43:8
weight (6)
17:5;43:16,17;50:9;
51:15;62:12
West (2)
14:10,12
what's (14)
7:20;15:1,24;32:12;
35:20;36:7,13;41:14;
46:3;57:18;58:16;59:21;
63:25;68:8
When's (1)
8:22
where's (1)
46:7
white (1)
44:12
whole (1)
4:7
who's (4)
23:16,16,18;47:13
wide (1)
29:22
wife (1)
23:2
William (2)
63:1,3
window (1)
52:18
wire (1)
47:14
within (9)
10:1;13:8;14:25;
22:17;25:6,9;31:19;
60:15;67:21
Without (5)
34:25;39:24,24;40:7,
10
work (5)
8:16;15:14;16:6;
17:24;30:3
worked (6)
13:3;16:12,25;21:22,
23;29:25
working (2)
23:18;30:23
Wow (1)

16:16
**Wright (12)**
  34:3;59:11,11;63:6;
  64:5,7,11,21,24;65:2,4;
  69:19
**W-R-I-G-H-T (1)**
  34:3
**writes (1)**
  27:10
**written (3)**
  9:12,13;37:19
**wrong (1)**
  40:6
**wrote (3)**
  37:8,22;38:7

### Y

**year (7)**
  9:8,10,11;13:11;
  16:18;32:17;34:10
**yearly (1)**
  9:5
**years (6)**
  10:1,13,14;11:7;
  13:21;14:20
**Yep (2)**
  22:1;59:19
**yes-or-no (1)**
  5:14
**yesterday (2)**
  12:20,21

### Z

**zip (1)**
  50:9